### A06A0487. OLDHAM v. SELF.
(632 SE2d 446)

MIKELL, Judge.

Brandy Dawn Self, individually and as administrator of the estate of decedent, Stephen A. Sumowski, and as next friend of

Sumowski's minor daughter, sued Kevin D. Oldham, Sumowski's former business partner and the beneficiary of Sumowski's $150,000 life insurance policy, for breach of contract, alleging that Oldham agreed to deposit $20,000 of the insurance proceeds into a trust for the benefit of Sumowski's minor child in exchange for Self's forbearance to sue. A jury found Oldham liable and awarded $20,000. The trial court entered judgment in favor of Self for $20,000, for the sole benefit of Sumowski's minor child. Oldham appeals, challenging the trial court's denial of his motion for directed verdict and arguing that the trial court gave an improper verdict form to the jury. Because we find that no enforceable contract existed, we reverse.

1. Oldham contends that the trial court should have granted his motion for directed verdict on Self's breach of contract claim because there was no enforceable contract. Although we are most reluctant to disturb any jury's verdict, we agree with Oldham's contention.

> The standard of review of a trial court's denial of a motion for a directed verdict is the "any evidence" standard. A directed verdict is authorized when there is only one reasonable conclusion as to the proper judgment; if there is no evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is error to deny the motion.[1]

So viewed, the evidence shows that Oldham and Sumowski were best friends and business partners in Dublin Transmission Service. Each owned $150,000 in life insurance on the other's life. The company dissolved in December 1999, after Sumowski twice overdosed on prescription drugs; however, a dissolution agreement was never signed because Sumowski committed suicide on May 8, 2000. Oldham received insurance proceeds in the amount of $150,421.87.

Shortly after Sumowski's death, Self, Sumowski's former girlfriend and the mother of his child, contacted attorney James Hilburn to discuss Sumowski's estate and an alleged buy/sell agreement involving the partners' life insurance policies. On May 26, 2000, Hilburn wrote to Oldham's attorney, Mitch Warnock, requesting a meeting on behalf of his client. During a meeting on June 14, 2000, Self and Hilburn learned that no buy/sell agreement existed. At that time, Oldham told Self he was considering setting aside $20,000 for Sumowski's minor child. Hilburn advised Oldham and Warnock that he wanted to discuss his client's options before proceeding and the

---

[1] (Punctuation and footnotes omitted.) *Citizens Trust Bank v. White*, 274 Ga. App. 508-509 (618 SE2d 9) (2005).

meeting was adjourned. With respect to the meeting, Hilburn testified, "I mean, we were just talking. There wasn't any agreements." The next day, Hilburn told Warnock that Self would not pursue any claims against the business on behalf of the estate or Sumowski's child if Oldham put $20,000 in a trust for the child's benefit. Warnock told Hilburn to prepare a trust agreement and send it to him, and that he would get back to Hilburn. When asked if he believed an agreement existed at that time, Hilburn replied, "[w]ell, . . . I felt we kind of had an understanding that he was going to put the twenty thousand dollars and we were going to do a trust. The exact terms had not been agreed to." On September 21, 2000, Hilburn sent to Warnock a proposed irrevocable trust, naming Self and Sumowski's brother as co-trustees. In response, Warnock advised Hilburn that Self would not be an acceptable trustee. According to Hilburn, Warnock voiced no other objections to the trust.

On October 20, 2000, Hilburn prepared and sent to Warnock a second proposed irrevocable trust, naming Oldham and Sumowski's brother as co-trustees. As to the status of the trust agreement on October 20, Hilburn opined as follows: "my recollection is that [Warnock] said I'm going to get it signed and get it back to you. And then there was later a report to my office that one of them had signed it. I believe that [Oldham] had signed it and they were waiting on the other person to sign it and then they'd get it on back to me." On November 1, 2000, Hilburn wrote to Warnock, requesting that Oldham and Sumowski's brother approve and sign two originals of the second proposed trust agreement. Warnock did not respond to Hilburn's letters or return the documents. On December 12, 2000, Hilburn again wrote to Warnock, requesting a status report on the trust agreement. Sometime between January 9, 2001, and January 12, 2001, Warnock telephoned Hilburn, explaining that Oldham had changed his mind and would not execute the trust agreement. During that conversation, Warnock told Hilburn to write a "real strong letter and I will get [Oldham] in here and talk to him." Hilburn sent to Warnock a "strong letter" documenting the parties' discussions and correspondence, and advising that, "[i]f the signed trust agreement has not been received in our office by January 19, 2001, I will recommend that Ms. Self go ahead and file a complaint to enforce the agreement." The remainder of the letter read as follows:

> I was very disappointed when you called and advised that [Oldham] had changed his mind and decided not to honor the agreement to place $20,000 in a trust fund for [Sumowski's child]. . . . [I]t is my opinion there was a very definite and legally enforceable agreement by [Oldham] to put $20,000 in

a fund for [the child]. I have reviewed my notes and correspondence. . . . We all agree that [Oldham] definitely offered to pay the $20,000. Brandy [Self] and I agreed that we would discuss the offer and advise you if she would be willing to accept the $20,000 and not pursue any claims against [Oldham] or Dublin Transmission. . . . Following my meeting with [Self], I notified you that she had agreed to accept the offer and that I had recommended that she request that the money be put into a trust. . . . You later requested that I send a draft of a proposed trust agreement for [Oldham] to look at and I did that. You then notified me that [Oldham] had agreed to sign the trust provided [Self] was removed as a trustee and Robert Sumowski substituted. That was agreed to and the revised trust agreement was mailed to you on November 1, 2000. When a follow-up call was made to your office regarding the status of the trust agreement, it was reported that [Oldham] had already signed it and that you were obtaining Robert Sumowski's signature. This was confirmed in my fax to you on December 12, 2000. [Warnock], if you disagree with any of these factual statements regarding [Oldham's] offer, our acceptance or your representations to me, please advise me in writing by January 19, 2001.

On January 17, 2001, Warnock called, stating that Hilburn's letter "worked" and that Oldham was bringing Warnock a check for $20,000 to place in his trust account, and that he wanted to discuss making a few changes in the trust agreement. On January 22, 2001, Warnock telephoned Hilburn, confirming that Oldham delivered to him a check in the amount of $20,000 "to hold until . . . [a] trust [was] drawn up" and advising that Oldham had some proposed changes to the trust agreement. With regard to any proposed changes, Warnock testified that he and Hilburn discussed the "revocable/irrevocable aspect of [the trust agreement]." On January 29, 2001, Hilburn wrote the following letter to Warnock:

This confirms your telephone statement to me on January 22 that Mr. Odum [sic] has delivered a $20,000 check to you which has been deposited in your trust account. I also understand that he has requested some changes in the trust agreement which you are going to fax to me. Please do that right away so that we can get this finally resolved. I certainly don't want to take a chance that Mr. Odum [sic] may change his mind again or some other factor intervenes to prevent our concluding this, as agreed.

Throughout April 2001, Hilburn wrote to Warnock several times asking that the matter of the trust agreement be resolved. On May 16, 2001, Warnock issued a check for $19,500 to Edward D. Jones Investments. On May 21, 2001, Hilburn received a letter from Warnock enclosing a copy of a revocable trust executed by Oldham, naming himself as trustee and benefitting Sumowski's minor child. On May 29, 2001, Hilburn responded to Warnock's letter, protesting that "the revised . . . Trust . . . does not conform to our agreement. You have converted an irrevocable trust to a revocable trust."

Self filed this action on September 17, 2001, alleging that Oldham breached his agreement to deposit $20,000 of insurance proceeds into an irrevocable trust for the benefit of Sumowski's minor child and seeking damages of $20,000. The first trial ended in a mistrial. In a second trial, the jury found "in favor of [Self] for the sole benefit of [Sumowski's minor child], the sum of $20,000."

"Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms."[2] Because a settlement agreement is a contract, it must meet the same requirements of formation and enforceability as other contracts.[3] "Only when a meeting of the minds exists will an agreement be formed. But the law also favors compromise, and when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced."[4] If an alleged settlement agreement is disputed by the parties, it must be in writing to be enforceable.[5] "Ideally, a writing satisfying this requirement consists of a formal written agreement signed by both parties. But letters prepared by the parties' attorneys may suffice if they memorialize the terms of the agreement."[6] In this case, the evidence does not establish that the parties reached an agreement regarding the type of trust to be created under the alleged settlement agreement. On the contrary, the telephone calls between Warnock and Hilburn in January 2001, and the attorneys' letters of May 21 and May 29, 2001, show that there was never any agreement about whether the trust would be revocable or irrevocable. Because there is no evidence that there was ever a meeting of the minds as to this essential term, we find there

---

[2] (Citation and punctuation omitted.) *Cline v. Lee*, 260 Ga. App. 164, 168 (1) (581 SE2d 558) (2003).

[3] See *Greenwald v. Kersh*, 275 Ga. App. 724, 725-726 (621 SE2d 465) (2005).

[4] (Citation omitted.) *Vildibill v. Palmer Johnson of Savannah, Inc.*, 244 Ga. App. 747, 748 (1) (536 SE2d 779) (2000). See OCGA § 13-3-2.

[5] See *Paul Dean Corp. v. Kilgore*, 252 Ga. App. 587, 590 (1) (556 SE2d 228) (2001).

[6] (Punctuation and footnote omitted.) Id. at 590-591 (1).

was no agreement to be enforced by the jury.[7] Accordingly, the trial court erred in denying Oldham's motion for a directed verdict.

2. In light of our holding in Division 1, we need not consider Oldham's challenge to the verdict form.

*Judgment reversed. Blackburn, P. J., and Adams, J., concur.*

DECIDED JUNE 9, 2006.

*Smith & Jenkins, Wilson R. Smith*, for appellant.
*Nelson, Gillis & Thomas, James M. Thomas*, for appellee.

---

[7] See, e.g., *Grossman v. Smith, Barney Real Estate Fund*, 211 Ga. App. 243, 245-246 (438 SE2d 700) (1993) (where there was no meeting of the minds as to essential terms of easement to be granted under settlement, settlement agreement held unenforceable).