A06A2416, A06A2417. RUSKIN et al. v. AAF-MCQUAY, INC. et al. (two cases).

(643 SE2d 333)

BARNES, Chief Judge.

These companion cases arise from a dispute between AAF-McQuay, Inc., a manufacturer of HVAC components and a 50 percent shareholder in McQuay of Georgia (MOG), and T. W. Ruskin, a 25 percent partner in the same entity. Ruskin had previously worked for one of McQuay's competitors, but agreed to become a partner in MOG, the sole distributor of McQuay products in Georgia. McQuay also agreed to provide a credit line of $500,000 (later increased to $600,000) to MOG until the new entity could establish its own credit. The partners soon parted ways over both control and finances of MOG, with Ruskin alleging that McQuay had failed to pay more than $600,000 for work done by MOG on McQuay products serviced under warranty and by concession, and with McQuay alleging that MOG owed it more than $1.2 million. By August 2004, McQuay declared a default on debt issued by MOG and notified the latter of its intent to seek an alternative distributor for its products, thereby revoking the parties' exclusive sales agreement.

Ruskin and MOG filed a verified complaint asserting, among other things, breach of the partnership agreement and breach of implied covenant of good faith and fair dealing. They alleged that McQuay had attempted to squeeze them out of the business in breach of the partnership agreement. Contemporaneously, Ruskin filed a motion for a temporary restraining order and injunctive relief. After the trial court granted the TRO and set a hearing on a permanent injunction, the parties engaged in extensive negotiations, culminating in a document entitled "MOG, Ruskin, [and] McQuay Agree to Settle All Disputes Among Them." The agreement's leading terms were that MOG pay McQuay $200,000 in cash and $600,000 in notes at closing in exchange for McQuay's release of claims against Ruskin and its transfer of its 50 percent share in the partnership to Ruskin and a third party. The agreement also provided, inter alia, that "certain loans will be extended, forbearances executed, [or] other

documents created to memorialize the relationship of the parties"; that the exclusive sales agreement would be phased out; and that "[a]ny documentation necessary to accomplish these actions will be done without adding any different or additional material terms or conditions, as *the parties intend the foregoing to constitute mutual agreement on all material terms of this settlement.*" (Emphasis supplied.)

The settlement agreement also contained a provision dealing with MOG's claims for services it performed for customers under warranty and by concession. Ruskin avows that such services represented more than $1 million over the life of the partnership, and that McQuay's principal means of placing MOG under financial pressure was to withhold more than $600,000 in payments for these services. The TRO, under which the parties had been operating, provided detailed provisions concerning these claims, such as distinguishing between claims submitted by MOG before and after September 23, 2004, and providing a time period within which claims would be paid.[1] The settlement agreement referred to both these claims and to the TRO's governing language about the claims:

> MOG waives any claim it may have against McQuay for warranty and concession claims that the parties have previously disputed at date of closing. Notwithstanding the foregoing, all warranty claims and items that were authorized or submitted during the pendency of the TRO will be processed per the TRO.

The parties contacted the trial court and requested that the upcoming hearing be cancelled, but subsequently could not agree on the ancillary documents needed to complete the settlement. McQuay eventually moved to enforce the settlement agreement. The trial court ruled that the parties had reached agreement on "all essential terms and conditions of the settlement," but that they continued to disagree on the language and terms of ancillary documents referred to in the settlement agreement, as well as on "the dollar amount of

---

[1] The TRO provided:
McQUAY shall pay [MOG] by check within one (1) week of acceptance of any invoices for warranty work authorized by McQUAY and invoiced after September 23, 2004. Strictly for purposes of the instant order, McQUAY will process the claims within two weeks of a properly presented warranty invoice claim to determine acceptance, consistent with McQUAY's policies and procedures. . . . With respect to invoices submitted prior to September 23, 2004, McQUAY shall pay by check all amounts McQUAY previously agreed to pay or approved with respect to inventory, warranty, concession and commission rebates, but which had not already been paid or applied for credit against the amounts MOG owes McQUAY, by October 10, 2004.

warranty claims and items authorized or processed by [McQuay] prior to the date of the Settlement Agreement." The trial court then ordered the parties to appear before a special master for the purpose of resolving these outstanding issues.

All of the special master's findings — including those involving the warranty and concession claims — were made pursuant to the trial court's central holding that an agreement had been reached on all essential terms. The special master's first set of findings settled numerous disputes concerning the terms of the "ancillary documents" referred to in the settlement agreement. The special master also found that the TRO provided workable formulas for the processing and payment of previously disputed warranty and concession items, and that MOG was entitled to a timely decision and payment concerning these items in the form of a check, not merely a credit memo, from McQuay. In his second set of findings, the special master noted that he had underestimated the "inventiveness of the parties in finding new issues or nuances in old issues," reported that the parties "were still unable to come together on final closing documents," recommended a set of final closing documents with some changes, and concluded that the trial court should adopt his decisions on all disputed issues as the final judgment enforcing the settlement agreement. The trial court agreed, as the final order reflected.

After Ruskin and MOG filed their notice of appeal, McQuay moved for a supersedeas bond, which the trial court granted in the amount of $285,095.63. Ruskin and MOG then filed a separate notice of appeal as to that bond.

## Case No. A06A2416

Ruskin and MOG's (collectively "Ruskin") principal argument is that because there was no meeting of the minds as to the amount of money owed by McQuay, particularly as to claims involving MOG's work pursuant to McQuay's warranty and concessions to its customers, the settlement agreement is unenforceable. McQuay argues that the agreement is enforceable, and that MOG's delaying tactics in implementing the settlement should not be rewarded.

1. We review the enforceability of settlement agreements de novo "if the parties rely on submission of affidavits and other evidence similar to that considered by a trial court in a ruling on motion for summary judgment." *Greenwald v. Kersh*, 275 Ga. App. 724, 725, n. 3 (621 SE2d 465) (2005).

> A settlement agreement must meet the same requirements of formation and enforceability as other contracts. Only when a meeting of the minds exists will an agreement be

formed. But the law also favors compromise, and when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced.

(Punctuation and footnote omitted.) Id. at 725-726. In other words, we generally enforce settlement agreements unless it appears that the parties clearly failed to reach agreement on an essential contract term. See, e.g., *Oldham v. Self*, 279 Ga. App. 703, 707-708 (1) (632 SE2d 446) (2006) (reversing jury verdict to enforce settlement agreement where parties did not agree whether trust would be revocable or irrevocable).

Ruskin's principal argument is that although MOG waived all claims it may have had "against McQuay for warranty and concession claims that the parties have previously disputed" many such claims, totaling approximately $237,000, had not been disputed before the breakdown of relations between the parties, and were therefore due to be paid under the same paragraph's provision that "all warranty claims and [other] items that were authorized or submitted during the pendency of the TRO will be processed per the TRO." We do not agree.

It is unnecessary that a contract state definitively and specifically all facts in detail to which the parties may be agreeing, but as to such matters, it will be sufficiently definite and certain if it contains matters which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves.

(Footnote omitted.) *Quadron Software Intl. Corp. v. Plotseneder*, 256 Ga. App. 284, 287 (1) (568 SE2d 178) (2002). As the special master noted, even if the settlement agreement itself raises questions concerning which claims were "previously disputed," the TRO sets out a detailed, coherent and workable scheme for paying claims arising before and after September 23, 2004, and there is nothing ambiguous about the settlement agreement's reference to the TRO concerning them. Nor is there any sign of partiality toward McQuay in the special master's determinations on this issue, since he ruled in MOG's favor on many relevant points.

Thus the trial court did not err when it found that the settlement agreement contained evidence of the parties' agreement on all essential terms, and was therefore enforceable. See *Quadron*, supra (enforcing contract as sufficiently definite concerning essential terms).

2. Ruskin also argues that the trial court erred when it adopted the special master's findings as a part of its final order. This argument

also lacks merit. Under OCGA § 9-7-2, the trial court has the power in equitable proceedings and upon its own motion to refer a case to an auditor. The auditor may then "pass upon all questions of law and fact." OCGA § 9-7-6; *Franklin v. Franklin*, 267 Ga. 82, 83 (1) (475 SE2d 890) (1996). Since Ruskin invoked the court's equitable powers when he sought a TRO and permanent injunction, he cannot now complain that the trial court exceeded its authority in delegating some of its powers to the special master.

### Case No. A06A2417

Ruskin argues that the trial court erred when it ordered that he post a supersedeas bond of more than $285,000. McQuay counters that the trial court had the discretion both to require a supersedeas bond and to set its amount. Ruskin argues that the trial court did not have the power to order a supersedeas bond because there was no "certain and definite money judgment upon which an execution could operate." See *Barge v. St. Paul Fire & Marine Ins. Co.*, 245 Ga. App. 112, 116 (2) (535 SE2d 837) (2000).

This argument fails for a number of reasons. As a preliminary matter, it appears that Ruskin has not posted the bond. Although this failure does not bar the appeal, it does give McQuay the freedom "to enforce the judgment at his peril pending decision on appeal." (Citation and punctuation omitted.) *Jonas v. Jonas*, 280 Ga. App. 155, 157 (1) (633 SE2d 544) (2006). Further, as the appeal concerning the enforceability of the settlement has been decided, the matter of the bond is moot. See *Almonte v. West Ashley Toyota*, 281 Ga. App. 808, 810 (637 SE2d 755) (2006). Even if we were to reach the merits, moreover, the trial court's order explicitly incorporated the special master's second set of findings, which itself attached and incorporated by reference the final version of the settlement agreement, including its provisions for payment, release of claims, and dissolution of the partnership. Just as Ruskin suggested in his complaint for breach of contract and petition for injunction, this case presents mixed questions of equity and law, and the trial court's final order enforces a contract. Thus the trial court did not err when it ordered Ruskin to post a supersedeas bond. See OCGA § 5-6-46 (a) (upon appellee's motion, the trial court "shall require that supersedeas bond or other form of security be given with such surety and in such amount as the court may require"); *In re Estate of Zeigler*, 273 Ga. App. 269, 271 (2) (614 SE2d 799) (2005) (affirming order for appellant to post bond pursuant to appeal of probate court's removal of an estate's executor).

*Judgment affirmed. Andrews, P. J., and Bernes, J., concur.*

DECIDED MARCH 7, 2007.

*Thompson Hine, Steven P. Smith, Cary Ichter, Tracy Hannan*, for appellants.
*Macey, Wilensky, Kessler, Howick & Westfall, Susan L. Howick, Michael C. Kaplan*, for appellees.