**THIRD DIVISION
BARNES, P. J.,
BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A1469. JAYCEE ATLANTA DEVELOPMENT, LLC v. PROVIDENCE BANK.

BRANCH, Judge.

Jaycee Atlanta Development, LLC ("Jaycee") obtained a $15 million line of credit from a bank that later failed and had its assets transferred to Providence Bank. When Jaycee defaulted on the loan, Providence sued Jaycee and its members, Charles Woodson and James Crawford, to recover the remaining principal balance, plus interest. On cross-motions for summary judgment, the trial court ruled in favor of Providence, and Jaycee, Woodson, and Crawford now appeal. For reasons that follow, we affirm.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact and that the undisputed facts warrant judgment as a matter of law. *Nixon v. Pierce County School Dist.*, 322 Ga. App. 745, 747 (746

SE2d 225) (2013). In reviewing the trial court's ruling on a motion for summary judgment, we apply a de novo standard of review and view the evidence in a light most favorable to the nonmoving party. *Graham v. HHC St. Simons*, 322 Ga. App. 693, 694 (2) (746 SE2d 157) (2013). We will affirm the grant of summary judgment if it is right for any reason. *Stephen A. Wheat Trust v. Sparks*, 325 Ga. App. 673, 679 (4), n. 8 (754 SE2d 640) (2014).

The record shows that Woodson and Crawford formed Jaycee with the goal of acquiring separate parcels of property near the Georgia Dome and assembling them into a multi-use development. Crawford and Woodson negotiated with Premier Bank, a financial institution based in Missouri, for a line of credit that would help them purchase the necessary parcels At the closing, which occurred in September 2007, Premier and Jaycee executed a loan agreement and promissory note for $15 million, and Crawford and Woodson executed personal guaranties on the note.[1]

In October 2010, the Missouri Division of Finance declared Premier to be insolvent, closed it down, and appointed the Federal Deposit Insurance Corporation

---

[1] The loan agreement and promissory note were subsequently amended many times, and in connection with these amendments, Woodson and Crawford executed reaffirmations of their guaranty agreements.

2

("FDIC") as receiver of its assets. The FDIC then transferred Premier's assets to Providence Bank.

In February 2011, Providence notified Jaycee that it was in default on the loan and demanded repayment. When Jaycee failed to pay, Providence sued Jaycee, Crawford, and Woodson for breach of the loan agreement, promissory note, and guaranties, seeking the remaining principal balance of more than $5 million, plus interest and attorney fees.[2] Providence attached copies of the relevant loan documents to the complaint. The defendants answered, denying liability, and Jaycee counterclaimed for breach of contract, alleging that Premier had broken certain oral promises.

Providence moved for summary judgment on its own claims, arguing that Jaycee borrowed money from Premier which it failed to repay in full, and that Crawford and Woodson were personally responsible for Jaycee's debt Providence also sought summary judgment on Jaycee's counterclaims. The defendants filed a cross-motion for summary judgment on Providence's claims, asserting a variety of defenses. In a lengthy, thorough order, the trial court granted Providence's motions

---

[2] Providence also asserted a claim for fraudulent conveyance against Jaycee, Crawford, Woodson, and a fourth defendant, but later voluntarily dismissed that claim.

3

and denied the defendants' motion. The defendants filed a timely notice of appeal. At Providence's request, the trial court entered an order requiring the defendants to post $1 million, as well as the subject property, "to secure the judgment pending appeal."[3]

On appeal, the defendants argue that Providence is not the real party in interest on the loan documents, that it failed to properly authenticate the loan documents, that the loan documents Providence produced are not the ones they signed, that the guaranties violate the statute of frauds, that Providence breached anti-assignment provisions in the loan documents, and that no supersedeas bond was authorized here. These arguments lack merit.

1. Pointing out that only "current holders of an interest in the contract" may sue on it, *Sawgrass Builders v. Key*, 212 Ga. App. 138 (1) (441 SE2d 99) (1994), the defendants assert that Providence failed to show that it has an interest in the loan agreements. But there was ample undisputed evidence that Providence was Premier's successor-in-interest in those agreements.

William Mitchell, a vice-president at Providence and its Rule 30 (b) (6) witness, testified that after Premier failed and the FDIC stepped in, Providence

---

[3] The trial court also denied the defendants' motions for reconsideration and new trial following entry of the supersedeas bond order.

"bought the assets" of Premier.[4] Mitchell also identified a document titled "Transfer of Liens" showing that the FDIC "has sold, transferred, assigned and conveyed" to Providence the Jaycee loan "and all other documents evidencing, securing or relating to the Loan." Finally, Mitchell identified a list that the FDIC supplied of all loans included in the asset purchase, and that list contains the Jaycee loan. The defendants, on the other hand, have pointed to no evidence suggesting that Providence is *not* Premier's successor-in-interest on the Jaycee loan documents.[5] Thus, the trial court

[4] This information is also publicly available on the FDIC's website at https://www.fdic.gov/bank/individual/failed/premier_mo.html. The trial court was entitled to – and did – take judicial notice of this information. See OCGA § 24-2-201 (b) (2) (allowing court to take judicial notice of adjudicative facts that are "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *R. S. B. Ventures v. Fed. Deposit Ins. Corp.*, 514 Fed. Appx. 853, 856 (II( (A) (1), n. 2 (11th Cir. 2013) (taking judicial notice of information on FDIC's website). The defendants argue that the trial court could not take judicial notice of the website because it failed to first inform the parties of its intention to do so and give them an opportunity to be heard. But this argument is based on case law decided under former OCGA § 24-1-4. See *Graves v. State*, 269 Ga. 772, 775 (4) (a) (504 SE2d 679) (1998), rev'd in part on other grounds, *Jones v. State*, 272 Ga. 900, 903 (2), n. 13 (537 SE2d 80) (2000). Under Georgia's new evidence code, a party is entitled to an opportunity to be heard on the propriety of taking judicial notice only "upon timely request," which may be made "after judicial notice has been taken." OCGA § 24-2-201 (e). The defendants have not shown that they made such a request. In any event, they do not argue that the information on the FDIC website is wrong.

[5] Mitchell also identified an FDIC-provided list of Premier assets that were excluded from the takeover. That list was completely redacted for privacy reasons,

5

properly rejected the defendants' real-party-in-interest defense. See *HWA Properties v. Community & Southern Bank*, 322 Ga. App. 877, 883 (1) (c) (746 SE2d 609) (2013) (given "affirmative and uncontradicted evidence" that bank's acquisition of other bank's assets after FDIC receivership included the subject loan, "unsupported assertion" that acquisition may not have included subject loan "constitutes mere speculation or conjecture that is insufficient to defeat . . . summary judgment") (citation omitted).[6]

2. The defendants also argue that Providence failed to properly authenticate the loan documents. We disagree.

_____

and Mitchell testified that he did not know what was on it. The defendants tout Mitchell's deposition concession that "I suppose it's possible" that the Jaycee loan is one of the blacked-out items on the "excluded" list, but as Providence points out, this statement is both speculative and inconsistent with the Jaycee loan's unmistakable appearance on the "included" list. Thus, the statement does not create an issue of fact as to whether Premier purchased the Jaycee loan.

[6] As part of its effort to establish ownership of the loan documents, Providence submitted the affidavit of Ted Henke, another of its vice-presidents. The defendants moved to strike the affidavit, arguing that Henke lacked personal knowledge and that his statements were hearsay. The trial court denied the motion, and the defendants enumerate that denial as error on appeal. Because consideration of the Henke affidavit is not necessary to determine that Providence presented undisputed evidence that it owns the loan, we do not reach the question of the affidavit's admissibility.

6

In general, "a writing will not be admitted into evidence unless the offering party tenders proof of the authenticity or genuineness of the writing." *Nyankojo v. North Star Capital Acquisition*, 298 Ga. App. 6, 7 (679 SE2d 57) (2009) (punctuation and footnote omitted). The requirement of authentication "shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901 (a). But the new Georgia evidence code specifies a number of documents that are self-authenticating and do not require "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility," including "[c]ommercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law." OCGA § 24-9-902 (9). Although the defendants concede that this statute encompasses the loan agreement and promissory note, as well as the amendments thereto, they insist that the guaranties are not self-authenticating. This argument lacks merit, as the statute applies not only to commercial paper, but also to "documents relating thereto," such as guaranty agreements. See *United States v. Varner*, 13 F.3d 1503, 1509-1510 (III) (C) (11th Cir. 1994) (assumption agreements showing transfer of promissory notes were self-authenticating under federal counterpart to OCGA § 24-9-902 (2)); see also *Gunter*

*v. True*, 203 Ga. App. 330, 334 (3) (416 SE2d 768) (1992) (guaranty agreement was "part and parcel of the note itself").

3. The defendants argue that even if the loan documents are admissible, there are disputes of fact as to whether they were the same documents that Crawford and Woodson signed, or intended to sign, at the closing. The defendants point out that some pages of the loan documents contain footers, while others do not, and that the content of the footers is not consistent from page to page. They also insist that the terms of the documents attached to Providence's complaint are different from what they negotiated. But the defendants have failed to present any evidence, beyond speculation, to support these claims.

Mark Burr, Premier's closing attorney, testified that he prepared the loan documents, which reflected the loan amount that Jaycee and Premier had initially agreed upon – $20 million. Burr brought the unsigned loan documents to the closing, which occurred at the law offices of Jaycee's local Atlanta counsel. The closing was attended by Burr, Crawford, and Steven Buckman, the defendants' lawyer, as well as a few non-parties. When Burr arrived, he learned that the parties had renegotiated the amount of the loan to $15 million, and he had to change and reprint pertinent pages

8

of the loan documents, including the guaranties, to reflect the new loan amount.[7] Although Burr did not have a clear memory of how, exactly, he accomplished this task (the closing occurred five years before his deposition), he testified that he probably used a printer at local counsel's office to print corrected pages from his laptop. With regard to the footer inconsistencies, Burr testified that in his experience, when printing a document from a system that is different from the one on which it was created, "these footers don't always transfer properly."

Burr testified that he personally observed Crawford sign the loan documents (except for Woodson's guaranty) at the closing table, and that Buckman gave him a signature page that Woodson had previously signed to be attached to Woodson's guaranty. Burr further testified that Buckman actively participated in the closing negotiations and that he reviewed the loan documents, including Woodson's guaranty, before they were executed. After the documents were executed and copies made, Burr boxed up the originals and sent them to Premier, keeping copies for himself and the defendants. During his deposition, Burr identified the loan documents attached to Providence's complaint as the ones executed at the closing.

---

[7] Aside from the loan amount adjustment, Burr did not testify to any other document changes that occurred at the closing table.

As to the defendants' evidence, Crawford admits that he personally signed a loan agreement, promissory note, and guaranty at the closing. During his deposition, however, he expressed doubt that the documents he signed were the ones Providence produced in this litigation because Providence's documents had footers on all pages except his signature pages. But Crawford was unable to identify any discrepancies in content between the documents he thought he signed and those produced by Providence. Later, he submitted an affidavit stating that to the best of his memory, "the loan documents that [he] guaranteed, and the guaranty that [he] signed, reflected a loan or line of credit in the amount of $20 million" rather than the $15 million shown in Providence's loan documents. But this assertion is flatly contradicted by his deposition testimony that he "never signed an agreement for $20 million."[8]

Woodson, for his part, did not recognize any of the loan documents at his deposition, could not recall the amount of the loan, and did not remember agreeing to guarantee the loan. He admitted, however, that the signature on the signature page

---

[8] During his deposition, Crawford testified that Premier agreed to reduce the loan amount at the defendants' request because they did not want to pay the higher closing costs associated with a larger loan. "On motion for summary judgment a party's self-conflicting testimony is to be construed against him unless a reasonable explanation for the contradiction is offered." *Freund v. Warren*, 320 Ga. App. 765, 769 (1) (740 SE2d 727) (2013) (citations omitted).

of his guaranty agreement is, indeed, his. After his deposition, Woodson executed an affidavit stating that he was asked to sign a guaranty, but professing doubt that the guaranty produced by Providence is the one he meant to sign because the signature page on Providence's document did not contain a footer. Like Crawford, the only discrepancy in content that Woodson identified is that he thought he was guaranteeing a loan of $20 million, not $15 million.

Neither Crawford nor Woodson kept copies of the closing documents, trusting instead that Buckman would have them. But Buckman testified that his copies of the documents were destroyed during a sewage backup at his office. Thus, the only copies of the final loan documents in the record are the ones supplied by Providence.

During his deposition, Buckman was not asked – and did not volunteer – any details about the closing. He did testify that Premier changed the terms of the deal in a manner unfavorable to his clients *before* closing, that he tried unsuccessfully to negotiate more favorable terms, and that his clients proceeded with the unfavorable deal anyway. Buckman later executed an affidavit stating that Burr prepared the loan documents before closing and sent copies to his clients, who "signed signatures pages to be presented at the closing and attached or collated with signature pages signed by Premier." According to Buckman, Burr arrived at the closing "with a set of Loan

11

Documents which were presumably the same documents for which he had previously requested signature pages," but the documents were modified at the closing to reflect a reduced loan amount. "As a result," Buckman averred, "the signature pages which had previously been signed did not correlate with the revised Loan Documents."

Months after executing their original affidavits, and days before the trial court ruled on the pending summary judgment motions, Anthony Delfre, Woodson and Buckman submitted supplemental affidavits identifying an additional alleged discrepancy between the Woodson guaranty that Providence produced and the guaranty that the defendants meant for him to sign. According to these supplemental affidavits, Buckman negotiated a guaranty that protected Woodson's assets by requiring Premier, in the event of default, first to pursue Jaycee, then foreclose on the collateral, before seeking payment from Woodson personally.[9] The final Woodson guaranty does not contain these protections.

This evidence, taken together, shows the following undisputed facts: (1) Burr provided copies of the loan documents ahead of time to Crawford and Woodson; (2)

---

[9] The trial court concluded that these affidavits were not timely filed and therefore did not consider them, a ruling that the defendants enumerate as error. Because we conclude, as explained *infra*, that the affidavits do not help the defendants, we need not decide whether the trial court erred by refusing to consider them.

Burr brought those same documents to the closing; (3) at the closing, Burr modified the documents to reflect a lower loan amount; (4) Crawford either personally signed the revised loan documents at the closing or provided signature pages that he had signed earlier; (5) Woodson was not present at the closing, but he was represented there by Buckman; (6) Buckman reviewed Woodson's revised guaranty before providing Burr with Woodson's pre-signed signature page to attach to it; (7) Burr gave copies of the executed loan documents to Buckman, who later lost them in a sewage accident; (8) Burr sent the originals to Premier; and (9) Burr later identified the loan documents produced by Providence as the ones executed at the closing. These facts do not support the defendants' contention that the loan documents that Providence produced are not the loan documents they signed.

First, to the extent that the defendants complain that the loan documents produced by Providence do not include terms they remember negotiating, the law is clear that parties to a contract "must exercise ordinary diligence in making an independent verification of contractual terms and representations" and ensure that they understand the contract's contents before signing it. *Megel v. Donaldson*, 288 Ga. App. 510, 514 (2) (654 SE2d 656) (2007) (citation and punctuation omitted) (party's assertions that she signed blank signature pages and did not know what she

13

was signing were insufficient to create a fact question). Accordingly, "[t]he rule [is] that one who signs a contract is presumed to know its contents." *Brewer v. Royal Ins. Co. of America*, 283 Ga. App. 312, 315 (1) (641 SE2d 291) (2007) (citation and punctuation omitted); see also *Primary Investments, LLC v. Wee Tender Care III*, 323 Ga. App. 196, 201 (2) (746 SE2d 823) (2013) (parties who had opportunity to read revised contract and discover changes from original draft are bound by what they signed). The defendants cannot create an issue of fact by belatedly recalling terms they believe should have appeared in a document that they reviewed and executed at closing.[10]

Second, despite the defendants' suggestions to the contrary, there is no evidence that the documents they executed at closing were later switched or substituted, in whole or in part, erroneously or otherwise. Although the defendants hypothesize that some sort of document shuffling must have occurred because the footers in the loan documents are inconsistent, both Burr and Buckman explained

---

[10] Because Woodson explicitly authorized his attorney to attach his executed signature page to his guaranty at closing, he is bound by Buckman's actions in so doing, and Buckman's knowledge of the contents of the guaranty is imputed to him. See OCGA § 10-6-58 (notice to agent of a matter connected with his agency is notice to the principal); *Casey v. Wachovia Bank, N. A.*, 273 Ga. 140 (539 SE2d 503) (2000) (applying this principle in lawyer-client relationship).

14

these inconsistencies as likely consequences of the last-minute change in the loan amount. Moreover, Burr's undisputed testimony establishes that he shipped the original loan documents to Premier, and there is no evidence that anyone altered or substituted them thereafter. The defendants failed to preserve their copies of the loan documents, and they have produced no alternate version. See OCGA § 24-10-1002 ("To prove the contents of a writing . . . the original writing . . . shall be required."). Under these circumstances, the defendants' claim that the Premier produced the wrong documents is mere speculation. Speculation, however, will not defeat summary judgment. See *HWA Properties*, 322 Ga. App. at 883 (1) (c).

4. The defendants contend that Providence's claims on the guaranties are barred by the statute of frauds, which requires that "[a] promise to answer for the debt, default, or miscarriage of another" must be in writing and signed by the guarantor. OCGA § 13-5-30 (2). The defendants cite *Dabbs v. Key Equipment Finance*, 303 Ga. App. 570 (694 SE2d 161) (2010), for the proposition that a guaranty is unenforceable if it fails to identify the debt, the principal debtor, the promisor, and the promisee. See id. at 572. But the guaranties at issue here plainly identify all four elements. The defendants appear to argue that these elements must appear on the same page as the guarantor's signature, but neither the statute nor

15

*Dabbs* imposes such a requirement. Thus, the statute of frauds does not bar Providence's claims on the guaranties.

5. The defendants claim that Premier breached anti-assignment provisions in the loan documents by assigning the loan to Providence. The defendants point to two provisions in the loan agreement, the first of which, found in Paragraph 8.1, is entitled "Exclusiveness":

> Lender agrees that in connection with any assignment by Lender, Lender will retain all of Lender's rights and obligations hereunder and under the Loan Documents and Borrower shall not be required to deal with any other person or entity other than Lender with respect to the Loan.

The second provision, found in Paragraph 8.14 and titled "Participation," states that while the lender may sell participation interests in the loan to other lenders,

> Lender shall at all times remain the lead lender and during the Loan Term, shall retain sole authority to make disbursements or to exercise remedies hereunder. . . . Lender agrees that it will at all times retain the majority participation interest in the Loan.

The defendants maintain that Premier's breach of these anti-assignment provisions prevents Providence from enforcing the loan agreements. We disagree.

16

To begin, the loan transfer is permitted by the terms of the loan agreement.[11] Paragraph 8.9 – which the defendants tellingly do not cite – provides that although the borrower may not assign its rights and obligations under the agreement, "[t]he rights of Lender under this Agreement are assignable in part or in full, and any assignee of Lender shall succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made . . . ." Moreover, Paragraph 8.1 expressly contemplates that the lender may assign its rights, and Paragraph 8.14 authorizes the lender to sell participation interests to other banks. Thus, although the loan agreement provided that Jaycee would not have to deal with other lenders, it also expressly stated that Premier could assign its rights and obligations. "[W]e are not at liberty to ignore the specific terms of the parties' written agreement." *Miller v. GGNSC Atlanta, LLC*, 323 Ga. App. 114, 123 (2) (746 SE2d 680) (2013).

But even if the loan agreement did contain an anti-assignment clause, that clause is not enforceable against Providence. When the FDIC was appointed as the receiver of Premier's assets, federal law specifically authorized it to transfer those assets to another bank, such as Providence. See 12 USCS § 1821 (d) (2) (G) (i). That

---

[11] For this reason, we find that the loan transfer did not impermissibly increase the risk of the guarantors pursuant to OCGA § 10-7-22.

17

statutory authorization cannot be thwarted by an anti-assignment clause in a contract that Premier entered into before it failed. See *First Nationwide Bank v. Fla. Software Svcs.*, 770 FSupp. 1537, 1541 (II) (M.D. Fla. 1991) (allegations that bank's acquisition of failed bank's assets after government receivership "violated the anti-assignment clauses of the contracts are without merit"); see also *Iberiabank v. Beneva 41-I, LLC*, 701 F3d 916 (11th Cir. 2012) (contractual terms purporting to limit receiver's power to enforce contract if bank's assets were transferred were not enforceable).[12]

6. The defendants complain that the trial court erred by ordering them to post a supersedeas bond and refusing to grant their motion for new trial as to the amount of the bond. But as Premier points out, we lack jurisdiction to consider these enumerations of error because the supersedeas order was entered *after* the defendants appealed the summary judgment order, yet they did not file a second notice of appeal. On appeal, we may consider orders that were entered prior to or contemporaneously

---

[12] In light of this ruling, we need not reach the question of whether the alleged anti-assignment clauses are also barred by the *D'Oench* doctrine, under which "oral agreements not recorded in bank documents between debtors and failed banks will not be enforced against the FDIC or its successors." *Kessler v. Multibank 2009-1 CRE Venture, LLC*, 324 Ga. App. 474, 475 (751 SE2d 121) (2013) (punctuation and footnote omitted); see also *D'Oench, Duhme & Co. v. FDIC*, 315 U. S. 447 (62 SCt 676, 86 LE 956) (1942).

18

with the judgment being appealed, see OCGA § 5-6-34 (d), but "[j]udgments cannot be considered on appeal if rendered subsequent to the judgment appealed from." *Norman v. Ault*, 287 Ga. 324, 331 (6) (695 SE2d 633) (2010) (punctuation and citation omitted).[13]

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*

---

[13] The defendants cite *Ruskin v. AAF-McQuay*, 284 Ga. App. 49 (643 SE2d 333) (2007), for the proposition that we have "routinely decided issues regarding supersedeas bonds without the requirement of a separate appeal," but in that case the appellant "filed a separate notice of appeal as to [the supersedeas] bond." Id. at 51.