**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

August 15, 2024

# In the Court of Appeals of Georgia

A24A0612. BOARD OF COMMISSIONERS OF BRANTLEY COUNTY v. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC et al.

A24A0638, A24A0639. BOARD OF COMMISSIONERS OF BRANTLEY COUNTY v. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC et al.; and vice versa.

A24A0679. SATILLA RIVERWATCH ALLIANCE, INC. v. DAVID DOVE, INTERIM DIRECTOR, ENVIRONMENTAL PROTECTION DIVISION, GEORGIA DEPT. OF NATURAL RESOURCES et al.

A24A0680. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC v. SATILLA RIVERWATCH ALLIANCE, INC.

BROWN, Judge.

The primary issue in these appeals is the propriety of a decision reversing an administrative law judge's revocation of a permit issued by the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") to Brantley County Development Partners ("the Developer") to build and operate a

solid waste landfill in Brantley County pursuant to OCGA § 12-8-20 et seq., Georgia's Comprehensive Solid Waste Management Act ("the Act"). For the reasons discussed below, we affirm.

## Background[1]

These appeals arise from an application filed by the Developer with EPD on December 29, 2016, pursuant to OCGA § 12-8-24, seeking a solid waste handling permit for a new municipal solid waste landfill, materials recovery, processing facility and thermal treatment facility on a parcel of land in Brantley County.[2] In Georgia, a

---

[1] This case involves multiple parties and numerous writings, and the record involves over 15 volumes and more than 4,000 pages. We note that for the most part, the parties' record citations are entirely unhelpful. For example, in Case No. A24A0612, the Board's brief on appeal cites to the ALJ's order for factual assertions. Our duty upon discretionary appeal "is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the local governing body or administrative agency." (Citation and punctuation omitted.) *Sawyer v. Reheis*, 213 Ga. App. 727, 729 (1) (445 SE2d 837) (1994). Citing to the ALJ's decision does not help us to satisfy this duty. As we have repeatedly reminded litigants, "[i]t is not the duty of this [C]ourt to cull the record on a party's behalf to locate information or facts in support of a party." (Citation and punctuation omitted.) *Bodiford v. Waltz*, 351 Ga. App. 532, 534 (2) (830 SE2d 738) (2019). Accordingly, to the extent we have missed something, the responsibility rests with counsel.

[2] The parcel is located in Waynesville, is bisected by U.S. Highway 82/State Highway 520 East, and was previously owned by Magnolia Land Holdings, LLC, before it was foreclosed upon.

person seeking to operate a solid waste handling facility must obtain a solid waste handling permit by application to EPD pursuant to the Act. See OCGA § 12-8-24 (a). As part of the permitting process, the applicant must submit two consistency letters from the local governing authority verifying that the proposed site complies with local land use ordinances and is consistent with the local or regional Solid Waste Management Plan (the "SWMP"). See OCGA § 12-8-24 (g); Ga. Comp. R. & Reg. 391-3-4-.02 (9) and 391-3-4-.05 (1) (a). See also *Dunn v. City of Stonecrest*, 368 Ga. App. 736, 737 (890 SE2d 781) (2023) (noting that the Act requires an applicant to provide written verification (a "'consistency letter'") to EPD that the proposed facility is consistent with the local SWMP); *Murray County v. R & J Murray, LLC*, 280 Ga. 314, 315-316 (627 SE2d 574) (2006) (explaining the purpose of the Act and the applicant's obligation to obtain written verification from the local government that the proposed facility is consistent with its SWMP). The Act also requires public participation when a county takes action regarding the siting of a publicly or privately owned municipal solid waste disposal facility. See OCGA § 12-8-26. See also *Emmons v. City of Arcade*, 270 Ga. 196, 197 (507 SE2d 464) (1998) (noting that OCGA § 12-8-26 governs "the conduct of local government meetings concerning solid waste

disposal facility site decisions," including scheduling and proper notice). Additionally, pursuant to EPD rules, written verification of local zoning compliance must be "reaffirmed by the governmental authority prior to permit issuance." Ga. Comp. R. & Regs. 391-3-4-.05 (1) (a).

During the application process — and in response to deficiency letters from EPD — the Developer submitted consistency letters executed in 2014 and 2015 by then-chairmans of the Brantley County Board of Commissioners ("the Board"), as well as documentation that a siting meeting was held on December 22, 2016, for public comment on the proposed solid waste facility.[3] On January 6, 2017, a year into

[3] On November 21, 2014, prior to purchasing the property, the Developer obtained letters from then-Brantley County Manager, Carl Rowland, certifying that the "Solid Waste Handling Facility located at the Magnolia Holdings Business Park complies with Brantley County's local land use plan" and that the proposed facility at "Magnolia Holdings Business Park" was consistent with Brantley County's SWMP; at that time, Brantley County did not have any zoning ordinances in effect. On October 3, 2018, the Developer submitted to EPD an "updated" zoning compliance letter and verification of SWMP consistency letter, both dated February 6, 2015, and signed by the Board's Chairman, Charles Summerlin. The letters stated that the Developer's proposed facility "at the former Magnolia Holdings Business Park is consistent with Brantley County's local land use plan" and is consistent with the County's SWMP, but reaffirmed that the County does not have a zoning ordinance. Specifically, the first letter provided: "The proposed private Solid Waste Handling Facility proposed by the [Developer] at the former Magnolia Holdings Business Park is consistent with Brantley County's local land use plan. Brantley County at the present time does not have a zoning ordinance." The second letter

4

the process, the Brantley County Board of Commissioners ("the Board") wrote to EPD voicing its "unanimous[ ]" opposition to the Developer's application on the ground that it did not comply with the requirements of OCGA § 12-8-26, and

provided: "The Board of Commissioners and its staff have reviewed the approved [SWMP] adopted by Brantley County and the Cities of Hoboken and Nahunta on June 26, 2006[,] and our most recent 2011 Five-year Short Term Work Program 2010-2019 and have determined that the solid waste handling facilities being proposed by [the Developer] to be located on a site formerly known as Magnolia Holdings Business Park is consistent with the plans and programs cited above. We further certify that Brantley County has a strategy and is actively engaged in meeting the statewide goal of reducing waste."

Although Summerlin subsequently disavowed the 2015 letters, alleging they were forgeries, that allegation was unequivocally rejected in *Brantley Co. Dev. Partners v. Brantley Co.*, 540 FSupp.3d 1291, 1308 (II) (A) (1) (a) (i) (S.D. Ga. 2021). In that case, the Developer filed suit against Brantley County and the Board, seeking a preliminary injunction barring the county from enforcing its "regulations" (a July 9, 2020 resolution by the Board withdrawing the 2015 consistency letters, the 2016 zoning ordinance, and 2017 and 2020 SWMPs) and an order requiring the Board to provide any and all necessary certifications to EPD so the Developer's permitting process can proceed. See id. at 1299-1302, 1316 (II) (A) (1) (c). The district court granted the injunction, enjoining the Board from applying its regulations to the Developer's property and its EPD permit, and ordering the Board to issue the reaffirmation of zoning consistency letter required by Ga. Comp. R. & Regs. 391-3-4-.05 (1) (a). Id. at 1320. In compliance with this order, the Board sent a letter to EPD on November 4, 2021, advising that "[t]he private Solid Waste Handling Facility proposed by [the Developer] at the former Magnolia Holdings Business Park was consistent with Brantley County's local land use plan on February 6, 2015. Brantley County did not have a zoning ordinance on that date, nor will [the] County be applying the zoning ordinance it attempted to adopt in 2016 to the project that is the subject of the [Developer's] application . . . to EPD." (Footnote omitted.)

5

asserting that the county had placed a 180-day moratorium on any type of waste facility. EPD nonetheless issued the permit on May 9, 2022.

Following issuance of the permit, the Board filed a petition to challenge EPD's action in a hearing before an ALJ of the Office of State Administrative Hearings pursuant to OCGA § 12-2-2 (c) (2) (A) and Georgia's Administrative Procedure Act (APA), OCGA § 50-13-1 et seq. The petition challenged the permit on various grounds, including that consistency letters issued in 2014 and 2015 by Brantley County officials — and required to be filed with all applications under the Act — concerned an entirely different parcel of property (the "Magnolia Holdings Business Park" on the north side of Highway 82,[4] not the property on the side south) and did not verify that the facility was consistent with the County's SWMP in existence at the time the letters were issued, and that failure to comply with the notice and meeting requirements of OCGA § 12-8-26 mandated revocation of the permit.[5] Both the

---

[4] According to the ALJ's final decision, the Board raised this issue for the first time five years after the Developer filed its application when outside counsel for the Board sent a letter to EPD in December 2021, arguing that the consistency letters were limited to "Magnolia Holdings Business Park," which referred only to the north parcel and not the south parcel.

[5] OCGA § 12-8-26 provides:

(a) Any county, municipality, group of counties, or authority beginning a process to select a site for a municipal solid waste disposal facility must first call at least one public meeting to discuss waste management needs of the local government or region and to describe the process of siting facilities to the public. Notice of this meeting shall be published within a newspaper of general circulation serving such county or municipality at least once a week for two weeks immediately preceding the date of such meeting. A regional solid waste management authority created under Part 2 of this article must hold at least one meeting within each jurisdiction participating in such authority, and notice for these meetings must be published within a newspaper of general circulation serving each such jurisdiction at least once a week for two weeks immediately preceding the date of such meeting.

(b) The governing authority of any county or municipality taking action resulting in a publicly or privately owned municipal solid waste disposal facility siting decision shall cause to be published within a newspaper of general circulation serving such county or municipality a notice of the meeting at which such siting decision is to be made at least once a week for two weeks immediately preceding the date of such meeting. Such notice shall state the time, place, and purpose of the meeting and the meeting shall be conducted by the governing authority taking the action. A siting decision shall include, but is not limited to, such activities as the final selection of property for landfilling and the execution of contracts or agreements pertaining to the location of municipal solid waste disposal

7

Developer and Satilla Riverwatch Alliance, Inc. ("Riverwatch") intervened in the administrative proceeding and the Developer filed a motion to dismiss count five of the Board's petition, which alleged that issuance of the permit was unlawful for failure to comply with OCGA § 12-8-26.

The ALJ summarily disposed of several claims in the petition and held a hearing on the remaining claims, namely that the consistency letters were not timely and did not apply to the facility that EPD permitted and that issuance of the permit was unlawful for failure to comply with OCGA § 12-8-26. Following the hearing, the ALJ issued a final decision on February 27, 2023, reversing EPD's decision. The ALJ concluded that the Board did not prove that EPD wrongfully issued the permit because the consistency letters were untimely, but it nonetheless found that the consistency letters were invalid because the facility approved by the Board in those letters was not the same facility proposed in the Developer's application: "[T]he preponderance of the admitted evidence proved that the facility located on 'the site formerly known as Magnolia Holdings Business Park' was on the north side of Hwy. 82, not the south side, where [the Developer's] proposed facility is" and that "the

_____

facilities within the jurisdiction, but shall not include zoning decisions.

8

phrase 'former Magnolia Holdings Business Park' [was] ambiguous." In so finding, the ALJ concluded that the consistency letters did not constitute written verification of SWMP consistency and that issuance of the permit was improper because EPD may not issue a permit without a valid SWMP consistency letter. Finally, the ALJ granted the Developer's motion to dismiss count five of the petition, concluding that based on the Supreme Court of Georgia's decision in *Emmons*, supra, EPD does not have jurisdiction to enforce compliance with OCGA § 12-8-26: "Consistent with . . . *Emmons*, . . . the Act did not require [EPD] to investigate whether the process of selecting the site for [the Developer's] private landfill was actually begun by local government officials, nor was EPD required to fashion a remedy for violation of a public meeting requirement under OCGA § 12-8-26." See *Emmons*, 270 Ga. at 198 (2) ("[t]he administrative jurisdiction of the EPD does not include determination of whether the city has comported with meeting and notice requirements, and does not provide for remedies for . . . violations of OCGA § 12–8–26").

*Appeal to the Superior Court of Bibb County*

On March 6, 2023, the Developer sought superior court review in Bibb County of the ALJ's decision reversing EPD's decision,[6] alleging that neither the Act nor EPD rules require consistency letters to describe specifically the location of a proposed facility. The Superior Court of Bibb County granted the Developer's petition and reversed the ALJ's decision, finding that "the ALJ erred as a matter of law when imposing an investigatory duty on EPD in regards to the February 2015 Consistency Letter to consider extrinsic evidence not presented to EPD at the time of Permit issuance." The superior court indicated that by issuing the consistency letter, the county verified that the facility *as proposed by the Developer in its application*, i.e., the parcel *south* of Highway 82, was consistent with its SWMP.

*Appeal to the Superior Court of Brantley County*

On March 29, 2023, the Board sought superior court review of the ALJ's decision dismissing count five in Brantley County. The Developer moved to dismiss the petition pursuant to OCGA § 9-11-12 (b) (1), alleging, inter alia, that the Board did not have standing because it suffered no injury, i.e., the ALJ reversed EPD's decision, which was the very relief the Board sought. The Superior Court of Brantley County

---

[6] The Developer's primary place of business is Bibb County. See OCGA § 50-13-19 (b).

denied the Developer's motion to dismiss and the Board's petition for judicial review, ruling that the ALJ correctly concluded that *Emmons* controlled, divesting the ALJ of subject matter jurisdiction over count five.

*Appeal to Superior Court of Ware County*

On March 29, 2023, Riverwatch sought superior court review of the ALJ's decision dismissing count five in Ware County.[7] The Developer moved to dismiss that petition as well, alleging, inter alia, that Riverwatch did not have standing because it suffered no injury, i.e., the ALJ reversed EPD's decision, which was the very relief sought. The Superior Court of Ware County denied the Developer's motion to dismiss and denied Riverwatch's petition for judicial review, ruling that the ALJ correctly concluded that *Emmons* controlled, divesting her of subject matter jurisdiction over count five.[8]

*Appeals to the Court of Appeals*

---

[7] Riverwatch's primary place of business is Ware County. See OCGA § 50-13-19 (b).

[8] The superior court judge who issued the order in Ware County is the same judge who issued the order in the Brantley County case.

11

In Case No. A24A0612, the Board appeals the decision of the Superior Court of Bibb County reversing the ALJ and reinstating the permit. In Case No. A24A0638, the Board appeals the decision of the Superior Court of Brantley County affirming the ALJ's dismissal of count five of its petition, and in Case No. A24A0639, the Developer cross-appeals, contending that the Board lacked standing to seek judicial review of the ALJ's decision. In Case No. A24A0679, Riverwatch appeals the decision of the Superior Court of Ware County, affirming the ALJ's dismissal of count five of the Board's petition, and in Case No. A24A0680, the Developer cross-appeals, contending that Riverwatch lacked standing to seek judicial review of the ALJ's decision.

*Case No. A24A0612*

1. In related enumerations, the Board contends that the Superior Court of Bibb County (a) applied the wrong standard of review to the ALJ's decision and (b) erred in reversing the ALJ's decision for several reasons. We disagree.

(a) The Board contends that the Superior Court of Bibb County applied the wrong standard of review to the ALJ's decision. Relying primarily on *Coastal Marshlands Protection Committee v. Altamaha Riverkeeper*, 315 Ga. App. 510 (726 SE2d

12

539) (2012), the Board asserts that the law requires the ALJ to conduct a de novo review but that the superior court ignored this standard.

In its order revoking the permit, the ALJ noted that it is "'required to make an independent determination based upon evidence presented' including any additional probative evidence admitted at the administrative hearing"; found that the location of proposed solid waste facilities are "a critically important part of a local SWMP"; and concluded that under the Act, EPD was required to coordinate its activities with "local governments, and, when necessary, conduct investigations and analyses to ensure compliance with the Act," including verifying "that the 'facility to be located on a site formerly known as Magnolia Holdings Business Park' was the same facility proposed in [the Developer's] application," which it did not do. The ALJ then held that the "preponderance of the probative evidence [admitted at the administrative hearing] proved that the phrase 'former Magnolia Holdings Business Park' referred to the tract of land on the north side of Hwy. 82" and that "the facility located on 'the site formerly known as Magnolia Holdings Business Park' was on the north side of Hwy. 82, not the south side, where [the Developer's] proposed facility is"; thus the 2015 consistency letter issued by the Board did not apply to the south site specified in

the Developer's application to EPD. The superior court rejected the ALJ's ruling, finding that it

> erred as a matter of law when imposing an investigatory duty on EPD in regards to the February 2015 Consistency Letter to consider extrinsic evidence not presented to EPD at the time of Permit issuance. . . . Neither the Act nor [EPD's] Solid Waste Rules require a solid waste management plan consistency letter to contain a description of the property for the location of the proposed facility.

The Board contends that the ALJ applied the proper standard and that the superior court impermissibly overruled the ALJ's findings of fact and improperly reversed the final decision "due to the ALJ's consideration of extrinsic evidence." We disagree.

"Judicial review of an administrative decision requires the court to determine that the findings of fact are supported by 'any evidence' and to examine the soundness of the conclusions of law that are based upon the findings of fact." *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 160 (3) (664 SE2d 223) (2008), citing OCGA § 50-13-19 (h). But, OCGA § 50-13-19 (h) specifically provides that

> [t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact [but] . . . [t]he court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings . . . are: . . . (5)

[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]

OCGA § 50-13-19 (h). "[T]he statute prevents a de novo determination of the evidentiary questions leaving only a determination of whether the facts found by the [ALJ] are supported by 'any evidence.'" *Hall v. Ault*, 240 Ga. 585, 586 (242 SE2d 101) (1978) (decided under former version of the statute). While the reviewing court accepts the findings of fact if there is any evidence to support them, it

> may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative . . . decision[ ] [is] (1) [i]n violation of constitutional or statutory provisions; (2) [i]n excess of the statutory authority of the agency; (3) [m]ade upon unlawful procedure; (4) [a]ffected by other error of law.

OCGA § 50-13-19 (h).

> Thus, the court is statutorily required to examine the soundness of the conclusions of law drawn from the findings of fact supported by any evidence, and is authorized to reverse or modify the agency decision upon a determination that the agency's application of the law to the facts is erroneous. A determination that the findings of fact are supported by evidence does not end judicial review of an administrative decision.

(Footnote omitted.) *Pruitt Corp.*, 284 Ga. at 161 (3). "On appeal from a superior court ruling in an administrative action, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency." (Citation and punctuation omitted.) *Harris v. Butler*, 368 Ga. App. 211 (889 SE2d 401) (2023). Further, "[t]his Court conducts a de novo review of claimed errors of law in the superior court's appellate review of an ALJ's decision. [T]he interpretation of a statute or regulation is a question of law and, thus, is also reviewed de novo on appeal." (Citation and punctuation omitted.) Id.

In *Coastal*, the Coastal Marshlands Protection Committee (the agency charged with permitting under the Coastal Marshlands Protection Act of 1970, see OCGA § 12-5-280 et seq.) appealed a superior court order vacating an ALJ's decision to affirm the Committee's decision to issue a permit for a moveable floating dock over a marshland. 315 Ga. App. at 510-511. The Committee alleged that the superior court erred by concluding that the ALJ committed a legal error by failing to consider whether the Committee abused its discretion in issuing the permit. Id. at 511. In rejecting the appellee Riverkeeper's assertion that an ALJ should deny a permit if

16

there was insufficient evidence before the Committee showing that a particular structure will not be contrary to the public interest, we explained that

> [u]nder the [APA], the ALJ was required to make an 'independent determination' based upon the evidence presented and was authorized to make any disposition available to the Committee when it reviewed the permit application. Requiring an ALJ to determine whether a permit applicant met its burden of proof before the Committee would vitiate the long-standing rule that an ALJ must make an independent determination of whether the permit would violate the provisions of the applicable statute or regulations.

Id. at 513-514. We further explained that

> [t]he superior court's involvement is an appellate proceeding and not a de novo trial. The standard of review for the superior court, as for us, is partly "any evidence," and partly "abuse of discretion." The ALJ's findings of fact must have been based on some evidence. As with any bench trial, the findings of fact are overturned even when supported by strong evidence, when they were "found" while the judge was operating under an erroneous view of the law. That part of an appellate decision is always, really, de novo. An "abuse of discretion" standard applies when the superior court, or our court, reviews the ALJ's finding that the project is in the public interest.

Id. at 514-515. In that case, the relevant statute provided that an applicant seeking a permit to build a structure over any marshland in Georgia must "demonstrate to the Committee that the proposed alteration is not contrary to the public interest and that no feasible alternative sites exist." (Citation and punctuation omitted.) Id. at 511-512. Because the superior court focused on whether the Committee's decision was right or wrong when it should have focused on whether the ALJ's decision was right or wrong, we reversed. Id. at 514-515.

In this case, the Board alleges that the superior court disregarded the ALJ's duty to make an independent determination when it ruled that "EPD correctly determined the February 2015 Consistency Letter to be sufficient to complete [the Developer's] Permit Application based on the information presented to EPD at the time the Permit [was issued]." But, the Board mischaracterizes the superior court's decision and the applicability of *Coastal* to this case. While *Coastal* makes clear that a superior court, as a reviewing court, may not reverse an ALJ's findings of fact if they are supported by "any evidence," it does not alter the rule that the superior court "is statutorily required to examine the *soundness of the conclusions of law* drawn from the findings of fact supported by any evidence." (Emphasis supplied.) *Pruitt Corp.*, 284

Ga. at 161 (3). Here, the superior court did not ignore or impermissibly overrule the ALJ's factual findings; the superior court reversed the ALJ because it erred as a *matter of law* in imposing upon EPD an investigatory duty to investigate and confirm consistency pursuant to OCGA § 12-8-24 (g).

(b) In a related enumeration, the Board contends that the superior court erred in reversing the ALJ "where such reversal was based entirely on the ALJ's undisturbed factual findings." The Board alleges that EPD's duty to follow its own rules to investigate or verify whether the consistency letters related to the proposed landfill is irrelevant to the ALJ's ultimate *factual* conclusion that the consistency letters did not relate to the landfill proposed by the Developer in its permit application. The ALJ's ultimate conclusion and reversal of the permit is premised entirely on the ALJ's finding of fact that the "Permit was wrongfully issued because [the Developer] failed to submit a valid consistency letter for the proposed facility." In other words, according to the Board, the superior court's analysis should have ended at its adoption of the ALJ's factual findings as, under the Act and Rules, a solid waste handling permit cannot be issued without a consistency letter for the specific facility proposed in the relevant application. But, this argument puts the cart before

the horse; as implied in Division 1 (a), supra, whether the superior court was required to accept the ALJ's factual findings regarding the content of the consistency letters is beside the point if EPD did not have an affirmative duty under the Act and its Rules to investigate the content of those letters. As EPD notes in its appellate brief, "[t]he superior court's reversal of the ALJ remains valid regardless of the extrinsic evidence issue, however, because the superior court's reversal hinges on the determination that [EPD] does not have an affirmative duty to investigate the consistency letters and consider extrinsic evidence."

(c) The Board contends that the superior court erred in reversing the ALJ's decision because the ALJ properly concluded that EPD is required to verify the congruency of a consistency letter and an application before issuing a permit. Relying primarily on OCGA § 12-8-23.1 (a) (7), the Board contends that EPD is required to consult and coordinate with local governments to verify the congruency of consistency letters and permit applications, and that in this case, a simple phone call or e-mail to the Board would have verified whether the locations designated in the consistency letter and the permit application matched.

EPD and the Developer disagree with the Board, contending that the superior court's decision should be affirmed because neither the Act nor EPD regulations require a consistency letter to include a location or obligate EPD to investigate location descriptors in consistency letters issued by local governments; in their view, local governments are in the best position to determine consistency with their SWMPs and the ALJ's ruling encroaches on that authority by requiring EPD to tell a local government what it meant when it drafted its own letters.

In its final decision, the ALJ concluded that OCGA §§ § 12-8-21 (d) and 12-8-23.1 (4) require EPD "to 'at all times coordinate [its] activities with' local governments, and, when necessary, conduct investigations and analyses to ensure compliance with the Act," and that EPD is required to ensure that a permit is consistent with a local government's SWMP before issuing a permit under OCGA § 12-8-31.1 (e). Based on these conclusions, the ALJ found that EPD "was obligated to verify that the 'facility to be located on a site formerly known as Magnolia Holdings Business Park' was the same as the facility proposed in [the Developer's] application," implicitly ruling that consistency letters issued by a local government

pursuant to OCGA § 12-8-31.1 (e) must include a description of the location of the proposed site.

In order to properly address the Board's argument that the ALJ's conclusions were correct, we must first look at the relevant statutes and regulations. OCGA § 12-8-21 (d) provides:

> It is further the intent of the General Assembly that the director of the Environmental Protection Division of the Department of Natural Resources shall be the official charged with primary responsibility for the solid waste management program. The director, in exercising any authority granted in this part, shall conform to and implement the policies outlined in this part and shall at all times coordinate his activities with those of other state agencies and local political jurisdictions so as to achieve a unified and effective solid waste management program in the state.

OCGA § 12-8-23.1 (a) (4) provides: "The director shall have and may exercise the following powers and duties: . . . To make investigations, analyses, and inspections to determine and ensure compliance with this part, the rules and regulations promulgated under this part, and any permits or orders which the director may issue." Subsection (a) (7) of this same Code section provides: "The director shall have and may exercise the following powers and duties: . . . To advise, consult, cooperate, and

contract on solid waste management matters with other agencies of this state, political subdivisions of this state, and other designated organizations, authorities, or entities[.]"

And, OCGA § 12-8-24 (g) provides:

Prior to the issuance of any permit for a solid waste handling facility or the granting of any major modification of an existing solid waste handling permit, the director shall require written verification to be furnished by the applicant that the proposed facility complies with local zoning or land use ordinances, if any; and after July 1, 1992, that the proposed facility is consistent with the local, multijurisdictional, or regional solid waste management plan developed in accordance with standards promulgated pursuant to this part subject to the provisions of Code Section 12-8-31.1. . . .

Code section 12-8-31.1 in turn sets forth the requirements for cities and counties to develop SWMPs, specifying the minimum factors to be included in SWMPs and providing that

[a]fter July 1, 1992, no permit, grant, or loan shall be issued for any municipal solid waste disposal facility or any solid waste handling equipment or recycling equipment used in conjunction therewith in a county or region which is not consistent with a local, multijurisdictional, or regional solid waste management plan. Each application for a permit, grant, or loan issued after July 1, 1992, shall include the following:

23

(1) Certification that the facility for which a permit is sought complies with local land use and zoning requirements, if any;

(2) Verification that the facility for which a permit is sought meets the ten-year capacity needs identified in the local, multijurisdictional, or regional solid waste management plan; and

(3) Demonstration that the host jurisdiction and all jurisdictions generating solid waste destined for the applicant's facility are part of an approved solid waste management plan or updated plan developed consistent with standards promulgated pursuant to this part, and are actively involved in, and have a strategy for, meeting the state-wide goal for reduction of solid waste disposal.

OCGA § 12-8-31.1 (e).

EPD's own rules are also relevant to our analysis. Rule 391-3-4-.02 of the Georgia Administrative Code provides: "The Director [of EPD] may issue permits for solid waste handling provided the application is judged complete and meets the requirements of the Georgia Comprehensive Solid Waste Management Act and these Rules." Ga. Comp. R. & Reg. 391-3-4-.02 (1) (b). And, subsection (9) of that same Rule provides:

Except for Private Industry Solid Waste Disposal Facilities, each applicant for a permit shall provide verification that the facility is

consistent with the local or regional solid waste management plans. The verification shall consist of letters from the host jurisdiction and generating jurisdictions verifying consistency with the approved local solid waste plans.

When this Court construes statutes, agency rules, and regulations,

we employ the basic rules of statutory construction and look to the plain language of the provision in question to determine its meaning. In doing so, we must construe the statute, rule, or regulation according to its [own] terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. Still, even if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the statute, rule, or regulation as a whole.

(Citations and punctuation omitted.) *Dept. of Community Health v. Houston Hosps.*, 365 Ga. App. 751, 760 (V) (880 SE2d 245) (2022). Moreover,

we only defer to an agency's interpretation when we are unable to determine the meaning of the legal text at issue. As a result, when a statute is not ambiguous after we apply canons of statutory construction, our case law does not support any deference to the Department's interpretation of the relevant . . . statutes, or to its interpretation of its own unambiguous regulations.

(Citations and punctuation omitted.) Id. at 761 (V). See also *Kennestone Hosp. v. Emory Univ.*, 318 Ga. 169, 183 (3) (897 SE2d 772) (2024) ("our long-held rule is that courts may defer to an agency's construction of its own rule only if its meaning is ambiguous, and once the traditional tools of construction are applied, few statutes or regulations are truly ambiguous") (citations and punctuation omitted). "Simply put, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly." (Citation and punctuation omitted.) *Houston Hosps.*, 365 Ga. App. at 771 (V) (2).

Bearing these principles in mind, we now consider whether the ALJ correctly ruled that EPD wrongfully issued the permit to the Developer because it failed to submit a valid consistency letter. While the General Assembly intended to charge the director of EPD with primary responsibility for SWMPs in Georgia, OCGA § 12-8-21 (d) does not require the director of EPD to investigate and ensure compliance with the Act. See OCGA § 12-8-23.1 (a) (4). See also *Nimmer v. Strickland*, 242 Ga. 430, 431 (1) (249 SE2d 233) (1978) (language in statute providing that tax commissioner "shall have authority" to proceed against purchaser is permissive and not mandatory); *Mayor and Council of Montezuma v. Brown Bros.*, 168 Ga. 1, 9 (147 SE 80) (1929)

26

("shall have and may exercise" means "if they choose"). Cf. *Southeast Ga. Health System v. Berry*, 362 Ga. App. 422, 423–424 (868 SE2d 820) (2022) (statute providing that Department of Community Health "shall have the authority to make public or private investigations" to determine whether provisions of CON program have been violated is discretionary language and imposes no duty to conduct a specific investigation). OCGA § 12-8-23.1 (a) (4) states that "[t]he director shall have and may exercise" the power to make investigations, but it does not impose a statutory duty on the director to investigate the intent or meaning of a consistency letter.

Moreover, while OCGA § 12-8-21 (d) places upon EPD primary responsibility for a unified and effective solid waste management program in Georgia, nothing in the statute requires EPD to go behind the consistency letters and investigate the soundness of a county's consistency determination on individual permit applications and/or whether that determination comports with the county's own SWMP. Finally, while EPD's rule governing consistency letters requires a permit applicant to "provide verification that the *facility* is consistent with the local or regional [SWMP]," (emphasis supplied) Ga. Comp. R. & Reg. 391-3-4-.02 (9), nothing in the Code sections or rules cited by the ALJ or the Board require EPD to investigate and

validate the congruency of consistency letters or require consistency letters to pinpoint, describe, or specify the precise geographical location or site of that proposed facility, and we "cannot add language to a statute by judicial decree." (Citation and punctuation omitted.) *Moosa Co. v. Commr. of Ga. Dept. of Revenue*, 353 Ga. App. 429, 432 (838 SE2d 108) (2020). See also *EEOC v. Abercrombie & Fitch Stores*, 575 U. S. 768, 774 (II) (135 SCt 2028, 192 LE2d 35) (2015) ("[w]e construe [a statute's] silence as exactly that: silence"); *Hynes v. State*, 341 Ga. App. 500, 511–512 (801 SE2d 306) (2017) ("To hold that the statute, in its silence, applies to tests administered at the direction of a judicial officer would require us to add words not found in the statute. This, we will not do.").

With regard to the siting of a facility, EPD's Rule 391-3-4-.01 (77) defines "Site" as "the entire property a permitted solid waste handling facility is located within and includes all activities within that property," and the Rules require that an "[a]pplication for a permit or for the transfer of a permit shall contain, but shall not be limited, to the following: . . . (e) For a permit application, a site assessment as required by Rule 391-3-4-.05[.]" See Ga. Comp. R. & Reg. 391-3-4-.02 (7). Rule 391-3-4-.05 (4) in turn provides: "The site assessment report shall be prepared in

28

accordance with Circular 14, 1991, (amended 1997) as published by the Georgia Geologic Survey, Georgia Environmental Protection Division."[9] Circular 14 contains "criteria for performing site acceptability studies for solid waste landfills in Georgia," and includes guidelines and recommendations for solid waste landfill site assessment reports ("SAR") and specifies the format for such a report. The Circular advises that a SAR include a discussion of the general site area and a "site topographic map" showing the surveyed boundaries of the site as well as adjacent lakes, ponds, and other bodies of water.

In this case, the cover page of the SAR prepared for the Developer and submitted to EPD with the Developer's application states: "**SITE ASSESSMENT REPORT FOR THE BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC (BCDP) U.S. 82 SOLID WASTE HANDLING FACILITY — SOUTH**." The report itself, as revised, contains a legal description of the property as well as several topographical maps including one outlining the proposed site south of Highway 82, and describes the general site area as follows: "The proposed landfill site

---

[9] Pursuant to OCGA § 24-2-201 (b) (2), we may take judicial notice of the documents on EPD's website. See *Jaycee Atlanta Dev. v. Providence Bank*, 330 Ga. App. 322, 324 (1), n.4 (765 SE2d 536) (2014) (recognizing that court may take judicial notice of information publicly available on FDIC's website).

is located south of U. S. Highway 82 approximately nine (9) miles east of the City of Nahunta in Brantley County, Georgia. . . . The proposed site is a[n approximately] 463 acre portion of a larger [approximately] 2,389 tract owned by the [Developer]." And, the application submitted to EPD by the Developer included a description of the site/facility location, its geographic coordinates, and a topographical map outlining in red the proposed site of the facility on the south side of Highway 82. As these materials demonstrate, the site of the facility on the south side of Highway 82 was disclosed; the siting information provided in these materials for the proposed facility complied with EPD's Rules and the relevant statutes; and, nothing required EPD to conduct an independent investigation into whether that proposed facility complied with Brantley County's SWMP as verified in the consistency letters executed by county officials. It follows that the superior court correctly reversed the ALJ and we affirm the judgment in Case No. A24A0612.[10]

Our holding is consistent with other statutes and EPD Rules that place the burden on the local governments to develop and implement their own SWMPs, with guidance from the Department of Community Affairs and EPD, including what

---

[10] The Board's motion to file supplemental brief, seeking to follow up on an issue raised during oral argument, is hereby denied.

30

factors the *local government* should consider when determining whether a proposed facility is consistent with its SWMP. See *Murray County*, 280 Ga. at 317, 318 (concluding that a local government is authorized to consider any relevant factor that it properly considered in developing its SWMP when making its determination of a proposed facility's consistency with its SWMP). See also OCGA § 12-8-31.1 (b); Ga. Comp. R. & Reg. 110-4-3-.01 (3) (outlining the purpose of the Act and providing that "[t]he Act, among other things, declares that in order to receive a permit, grant, or loan for a solid waste management facility, each city and county shall develop or be included in a comprehensive solid waste management plan"). Compare OCGA § 12-8-31 (governs the statewide SWMP, to be developed by EPD, "jointly with the Department of Community Affairs," and serves as the guide for development of local SWMPs). Requiring EPD to verify a county's determination as to whether a proposed facility complies with the county's own SWMP would run counter to the governing statutes and rules. See also *Murray Co.*, 280 Ga. at 317, n.15 (noting that Ga. Comp. R. & Reg. 110-4-3-.03 (4) (c) "impose[s] upon the *local government* the duty to 'take all action necessary or desirable to implement the approved and adopted

31

comprehensive solid waste management plan'"") (punctuation omitted; emphasis supplied).

*Case Nos. A24A0638, A24A0639, A24A0679, and A24A0680*

As a reminder, the ALJ granted the Developer's motion to dismiss count five of the petition, which alleged that EPD's issuance of the permit was unlawful for failure to comply with OCGA § 12-8-26. In dismissing this count, the ALJ concluded that based on the Supreme Court of Georgia's decision in *Emmons*, EPD does not have jurisdiction to enforce compliance with OCGA § 12-8-26: "Consistent with . . . *Emmons*, . . . the Act did not require [EPD] to investigate whether the process of selecting the site for [the Developer's] private landfill was actually begun by local government officials, nor was EPD required to fashion a remedy for a violation of public meeting requirements under OCGA § 12-8-26." See *Emmons*, 270 Ga. at 198 (2) ("[t]he administrative jurisdiction of the EPD does not include determination of whether the city has comported with meeting and notice requirements, and does not provide for remedies for . . . violations of OCGA § 12-8-26"). The superior courts of Brantley and Ware counties affirmed the ALJ, and the Board and Riverwatch appeal that decision in Case Nos. A24A0638 and A24A0679. In Case Nos. A24A0639 and

32

A24A0680, the Developer has cross-appealed, contending that neither the Board nor Riverwatch had standing to appeal to superior court.

2. We consider first the Developer's cross-appeals. The Developer contends that the superior courts of Brantley and Ware counties erred in denying its respective motions to dismiss for lack of subject matter jurisdiction because the Board and Riverwatch did not have standing to seek superior court review given that they prevailed under the ALJ's decision for which review was sought; the parties' speculative injuries were premised on future events, i.e., possible reversal of the ALJ's final decision by the superior courts. According to the Developer, although the superior courts reached the right result on the merits by affirming the ALJ's dismissal of count five, the petitions should have been dismissed at the outset for lack of standing. The Developer further contends that Riverwatch's limited status as an intervenor renders it without standing to file a petition for judicial review. We are not persuaded.

The APA provides that

[a]ny person who has exhausted all administrative remedies available within the agency and who is *aggrieved* by a final decision in a contested case is entitled to judicial review under this chapter. This Code section

does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law. A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy.

(Emphasis supplied.) OCGA § 50-13-19 (a). See also OCGA § 50-13-20.1. In the context of the APA, "the word 'aggrieved' has been interpreted to mean that the person seeking to appeal must show that he has an interest in the agency decision that has been specially and adversely affected thereby." *Ga. Power Co. v. Campaign For a Prosperous Ga.*, 255 Ga. 253, 256 (1), 257 (2) (336 SE2d 790) (1985) (noting additionally that under entire statutory scheme applicable to public service commission proceedings, "any 'party' to [the] proceedings . . . may be 'aggrieved' by a decision which is adverse to the position that it takes therein") (citation omitted). See also Black's Law Dictionary (11th ed., 2019) (defining "aggrieved" as "having legal rights that are adversely affected; having been harmed by an infringement of legal rights").[11]

---

[11] We perform a statutory standing analysis here as opposed to one of constitutional standing. See *Oldham v. Landrum*, 363 Ga. App. 284, 293 (2) (a) (870 SE2d 82) (2022) (Pinson, J., concurring in part and dissenting in part) ("The United States Supreme Court, to which we often look for guidance on standing issues, . . . has

(a) The Board and Riverwatch essentially argue that they are aggrieved by the ALJ's adverse ruling because they have an interest in ensuring citizen participation and input in government decisions regarding siting decisions that may be harmful to the local land and watershed. They further point out that they had no choice but to petition for judicial review because the APA does not allow for cross-appeals.

While Georgia's appellate courts have never addressed this exact situation, we conclude here that the Board and Riverwatch are aggrieved because the ALJ's ruling on count five was adverse to their interests in the case. Cf. *Thebaut v. Ga. Bd. of Dentistry*, 235 Ga. App. 194, 198 (2), 199 (2) (509 SE2d 125) (1998) (rejecting argument that petition seeking review of Board's final decision issuing letter of concern was not subject to judicial review because petitioner could not be aggrieved by disciplinary action that was only disclosed to him: "Regardless of the nature of the sanctions imposed, the final decision is still a 'final decision in a contested case' and

---

said exactly that: whether a particular plaintiff has a cause of action under the statute is merely a question of statutory interpretation and does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case. The Supreme Court of Georgia has similarly held that whether a plaintiff falls within the class of persons a statute authorized to invoke a particular remedy did not affect the superior court's subject matter jurisdiction over the plaintiff's claims.") (Citations and punctuation omitted; emphasis omitted.)

is therefore 'entitled to judicial review under' the APA. . . . [I]t is the Board's final decision after a contested case hearing that is being appealed.'"). Moreover, we agree with the Board and Riverwatch that it was proper to deny the Developer's motions to dismiss because the APA has no provision for a cross-appeal, thus leaving them with no ability to preserve their claim of error; waiting until the Developer had prevailed in its petition for judicial review would have cost them their rights to petition for review under the APA. As the Eleventh Circuit has recognized, if an adversary files a petition for judicial review, posing a risk that an agency's favorable decision will be eliminated after judicial review, "[t]he only defense against such a scenario is the filing of a protective petition for review." *Reich v. Trinity Indus.*, 16 F3d 1149, 1156 (II) (11th Cir. 1994). This is exactly what the Board and Riverwatch did. The APA does not provide for a cross-appeal procedure, and as the *Reich* court duly noted in regard to federal administrative procedure, "failing to provide for a cross-appeal procedure in this situation . . . leads to wasteful and nonproductive litigation, and we welcome an examination of this problem and possible resolution[.]" Id.

(b) We also find no merit in the Developer's contention that Riverwatch's limited status as an intervenor renders it without standing to file a petition for judicial

review. Pretermitting that such an argument would render the Developer without standing to file its petition for judicial review of the ALJ's decision reversing EPD's decision,[12] our Supreme Court has sanctioned such action. See *Ga. Power*, 255 Ga. at 258 (2) ("when persons who have been permitted to intervene, and who have established standing to seek judicial review, take an appeal to superior court," review is limited to the record, OCGA § 50-13-19 (g)). See also *Fulton County Taxpayers Foundation v. Ga. Public Svc. Comm.*, 287 Ga. 876, 879-880 (2) (700 SE2d 554) (2010) (reiterating that an intervenor may file a petition for judicial review and noting that "in order to exhaust administrative remedies before [an agency], a person must file a timely application for leave to intervene"; failure to do so divests the person of standing to seek judicial review).

3. The Board and Riverwatch contend that the superior courts of Brantley and Ware counties erred in affirming the ALJ's dismissal for lack of jurisdiction of count five of the Board's petition. In its final decision, the ALJ ruled that pursuant to

---

[12] In its order granting Riverwatch's motion to intervene, the ALJ limited Riverwatch to participation in pre-administrative hearing proceedings and filings, and indicated that it would revisit "the participation of [the Developer] and [Riverwatch] . . . in the administrative hearing, if necessary." The order also noted that "the APA does not grant intervenors 'party status' or the right 'to present evidence, cross-examine witnesses, or otherwise be fully heard on the issues involved.'"

*Emmons*, EPD's jurisdiction does not include a determination of whether Brantley County comported with the meeting and notice requirements of OCGA § 12-8-26. The Board and Riverwatch sought judicial review of this decision and the superior courts affirmed, ruling that the administrative jurisdiction of EPD does not include a determination of whether the county comported with the meeting and notice requirements of OCGA § 12-8-26, and that, therefore, the ALJ correctly ruled that it did not have subject matter jurisdiction over count five of the Board's petition. The Board and Riverwatch allege that the ALJ and the superior courts erred as a matter of law in construing *Emmons* as holding that EPD does not have a duty to verify compliance with the public participation requirement. We find no error.

The provisions of OCGA § 12-8-26 are set forth in their entirety in footnote 5, supra. As the Supreme Court of Georgia noted in *Emmons*, OCGA § 12-8-26 "govern[s] the conduct of local government meetings concerning solid waste disposal facility site decisions." 270 Ga. at 197. Pursuant to OCGA § 12-8-26 (a), counties, municipalities, or authorities beginning the process to select a site for a municipal solid waste disposal facility must hold a "meeting to discuss waste management needs of the local government or region and to describe the process of siting facilities to the

38

public," and the meeting must be properly noticed. Similar to subsection (a), subsection (b) of OCGA § 12-8-26 requires "[t]he governing authority of any county or municipality taking action resulting in a publicly or privately owned municipal solid waste disposal facility" to publish notice before "taking action resulting in a publicly or privately owned municipal solid waste disposal facility siting decision." Additionally, EPD's Rules provide:

> The following criteria must be met for a site proposed as a solid waste handling facility: . . . Disposal Facility Siting Decision. Whenever any county, municipality group of counties, or authority begins a process to select a site for a municipal solid waste disposal facility, documentation shall be submitted which demonstrates compliance with OCGA 12-8-26 (a), and whenever the governing authority of any county or municipality takes action resulting in a publicly- or privately-owned municipal solid waste disposal facility siting decision, documentation shall be submitted which demonstrates compliance with OCGA 12-8-26 (b).

Ga. Comp. R. & Reg. 391-3-4-.05 (1) (b). See also Ga. Comp. R. & Reg. 391-3-4-.03 (delineating the relevant governing authority's duty to notice and hold meetings and a permit applicant's duty to publish public notice of its application).

In *Emmons*, the City of Arcade entered into a contract with a private developer for the development of a solid waste landfill on annexed property. 270 Ga. at 196-197.

A group of citizens filed an action for declaratory judgment and injunctive relief, alleging that the city failed to comply with the notice provisions of OCGA § 12-8-26. Id. at 197. The trial court agreed, declared the contract void, and granted injunctive relief against the city taking action in furtherance of the decision violative of OCGA § 12-8-26. This Court affirmed the declaratory relief but reversed the injunctive relief, concluding that the trial court did not have jurisdiction to enter an injunction because only EPD is empowered to issue a permit for a landfill, with appeal therefrom pursuant to OCGA § 12-2-2 (c): "Generally, when administrative review is available, that procedure is an adequate remedy at law, precluding equitable relief." Id. at 198 (2). The Supreme Court of Georgia reversed, concluding that the city's actions were ultra vires and that the trial court was empowered to enjoin the city from any actions that "would attempt to circumvent the court's order." In so concluding, the Court found that

> [t]he administrative jurisdiction of the EPD does not include determination of whether the city has comported with meeting and notice requirements, and does not provide for remedies for the city's violations of OCGA § 12-8-26; it provides redress only to those aggrieved or adversely affected by any order or action of the director. It is the city's flawed decision-making process that has aggrieved the

40

> petitioners. Therefore, the administrative permitting process, and its appeal provisions, do not provide the petitioners with an adequate remedy and the superior court did have jurisdiction to issue an injunction.

(Punctuation omitted.) Id.

The Board attempts to distinguish *Emmons* on the ground that the citizen-plaintiffs in that case were challenging the city's actions and not any action by EPD. But, this argument is a distinction without a difference. Like the citizen-plaintiffs in *Emmons*, the Board alleged in its petition for administrative review a failure to comply with the requirements of OCGA § 12-8-26. In fact, the Board — as an arm of Brantley County — is challenging its own failures with respect to OCGA § 12-8-26.[13] The Supreme Court's acknowledgment in *Emmons* that "[t]he administrative jurisdiction of the EPD does not include determination of whether the city has comported with meeting and notice requirements, and does not provide for remedies for . . . violations of OCGA § 12-8-26," applies equally in this case. 270 Ga. at 198 (2). Moreover,

---

[13] Under the plain language of OCGA § 12-8-26, the responsibility for scheduling and noticing siting meetings rests squarely on the shoulders of the city, county, or other governing authority. To place the onus on EPD to manage such meetings would contravene the plain language of the statute.

contrary to the Board's contention, the holding in *Emmons* does not foreclose a remedy. Indeed, as the Developer points out in its brief, Brantley County citizens and Riverwatch could have followed the Supreme Court of Georgia's instruction in *Emmons* and sought equitable relief in superior court for the county's failure to comply with the meeting requirements of the Act. It follows that the Superior Courts of Brantley and Ware counties correctly affirmed the ALJ's decision granting the Developer's motion to dismiss count five of the Board's petition, and we affirm the decisions in Case Nos. A24A0638 and A24A0679.

*Judgments affirmed. Padgett, J., concurs. Dillard, P. J., concurs fully and specially.*

A24A0612. BOARD OF COMMISSIONERS OF BRANTLEY COUNTY v. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC et al.
A24A0638, A24A0639. BOARD OF COMMISSIONERS OF BRANTLEY COUNTY v. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC et al.; and vice versa.
A24A0679. SATILLA RIVERWATCH ALLIANCE, INC. v. DAVID DOVE, INTERIM DIRECTOR, ENVIRONMENTAL PROTECTION DIVISION, GEORGIA DEPT. OF NATURAL RESOURCES et al.
A24A0680. BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC v. SATILLA RIVERWATCH ALLIANCE, INC.

DILLARD, Presiding Judge, concurring fully and specially.

This past term, the Supreme Court of the United States finally (and rightly) swept *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[1] into the dustbin of history. But here in Georgia, the spectre of *Chevron* remains. Indeed, the Supreme Court of Georgia has explicitly characterized its agency deference precedent as being "in accord with that identified . . . in *Chevron*."[2] But the jurisprudential folly of

---

[1] 467 U. S. 837 (104 SCt 2778, 81 LEd2d 694) (1984), *overruled by Loper Bright Enters. v. Raimondo*, No. 22-1219, __ U.S. __ ( __ SCt __, __ LE2d __), 2024 WL 3208360, at *21 (June 28, 2024).

[2] *Cook v. Glover*, 295 Ga. 495, 500 (761 SE2d 267) (2014).

*Chevron* is no more, and so the time is now ripe for our Supreme Court to follow suit and jettison this patently unconstitutional interpretive doctrine.

As Justice Peterson aptly notes in his concurrence to the denial of certiorari in *Cazier v. Georgia Power*,[3] "interpreting the law is the role of courts; judicial deference to executive branch legal interpretations poses a risk to the separation of powers; and, in any event, *whatever* permissible role there might be for such deference, a law is not 'ambiguous' simply because interpreting it is hard."[4] And so, like Justice Peterson, I write separately to "express my growing doubt about . . . recent precedents requiring judicial deference to executive branch agencies' interpretation of legal text."[5]

In his thoughtful concurrence, Justice Peterson comprehensively and ably explains why the Supreme Court of Georgia's *Chevron*-style deference precedent is

---

[3] 315 Ga. 587 (883 SE2d 517) (2023).

[4] *Id.* at 587 (Peterson, J., concurring); *see also City of Guyton v. Barrow*, 305 Ga. 799, 803 (828 SE2d 366) (2019) (noting that courts may only "conclude that an ambiguity exists [in a regulation] . . . after we have exhausted all tools of construction").

[5] *Cazier*, 315 Ga. at 587 ; *see also AU Med. Ctr., Inc. v. Dep't of Cmty. Health*, 366 Ga. App. 94, 99 n.31 (880 SE2d 275) (2022) (Dillard, P.J.,) (noting that "[s]ome judges of this Court believe the time has come to reconsider [*Chevron*] deference"), *cert. denied* (Mar. 19, 2024); *Dep't of Cmty. Health v. Houston Hosps., Inc.*, 365 Ga. App. 751, 766 n.58 (880 SE2d 245) (2022) (Dillard, P.J.) (same).

ill-founded and finds no support in the text, history, or structure of the Georgia Constitution.[6] And while I agree with the vast majority of his reasoning,[7] I am not persuaded there is a meaningful difference, generally speaking, between the nature of the judicial power identified in the federal and Georgia Constitutions,[8] or between the

---

[6] *See generally Cazier*, 315 Ga. at 587-598.

[7] Justice Peterson and I are in complete agreement as to the importance of state constitutions, as well as the need for our Supreme Court to consistently seek to discern the original public meaning of the Georgia Constitution, rather than reflexively assume our constitution simply mirrors any analogous provisions contained in the federal constitution. *See generally* JEFFERY S. SUTTON, 51 IMPERFECT SOLUTIONS: STATES AND THE MAKING OF AMERICAN CONSTITUTIONAL LAW 11-20 (2018). But in my view, overarching questions about the inherent nature of judicial power, the separation of powers, and constitutional standing (along with other justiciability issues) will often—if not always—be informed by looking to the original public meaning of the United States Constitution's analogous text, as properly informed by that founding document's structure and history. *See infra* notes 9-10. And in the absence of any meaningful, explicit textual differences in our respective state constitutions, the fundamental nature of these central tenets of the *American* judicial power should not vary. *Id.*

[8] *Compare* U.S. CONST., Art. III, Sec. 1 ("The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."), *and* U.S. CONST., Art. III, Sec. 2 ("The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States . . . to controversies to which the United States shall be a party . . . ."), *with* GA. CONST. of 1983, Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in the following classes of courts: magistrate courts, probate courts, juvenile courts, state courts, superior courts, state-wide business court, Court of Appeals, and Supreme Court."). *See generally Sons of Confederate Veterans et al. v. Newton Cnty. Bd. of Commissioners*, 368

nature of the separation of powers in our respective governments.[9] In my view,

---

Ga. App. 511, 520-23 (890 SE2d 468) (2023) (Dillard, P.J., concurring *dubitante*) (expressing skepticism that there is any meaningful difference between the nature of the judicial power enshrined in the federal and Georgia constitutions, and noting that courts resolving cases and controversies "goes to the very heart of the *American* judicial power"), *cert. denied* (Feb. 20, 2024).

[9] To be sure, the Georgia Constitution—unlike the federal constitution—enshrines the separation-of-powers doctrine in its text; but I see no meaningful difference—in overarching doctrine or practice—between our constitution and the United States Constitution in this respect. *See* GA. CONST., Art. I, Sec. II, Par. III (1983) (noting that "[t]he legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided"); *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 201 (48 SCt 480, 72 LE 845) (1928) ("The rule established by the American Constitutions, *both state and federal*, divides the government into three separate departments—the legislative, executive, and judicial. Some of our state Constitutions expressly provide in one form or another that the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other. Other Constitutions, *including that of the United States*, do not contain such an express provision. *But it is implicit in all, as a conclusion logically following from the separation of the several departments . . . .* And this separation and the consequent exclusive character of the powers conferred upon each of the three departments is basic and vital—not merely a matter of governmental mechanism." (emphasis supplied) (citation omitted)); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 116 (135 SCt 1199, 191 LE2d 186) (2015) (Thomas, J., concurring in judgment) ("The [federal] Constitution's particular blend of separated powers and checks and balances was informed by centuries of political thought and experiences . . . . Though the theories of the separation of powers and checks and balances have roots in the ancient world, events of the 17th and 18th centuries played a crucial role in their development and informed the men who crafted and ratified the Constitution."); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, Vol. III, p. 445 (1833) ("These considerations teach us to applaud

4

*Chevron*-style deference is fundamentally incompatible with the *American* judicial power,[10] as well as the American understanding of the separation-of-powers doctrine.[11]

To be sure, there are textual differences between the United States and Georgia Constitutions in describing the judicial power,[12] and the Georgia Constitution—unlike the federal constitution—actually contains a provision explicitly recognizing the

---

the wisdom of those states, who have committed the judicial power, in the last resort, not to a part of the legislature, but to distinct and independent bodies of men . . . Georgia . . . .") (citation omitted).

[10] *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (132 SCt 1421, 182 LE2d 423) (2012) ("[T]he Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." (punctuation omitted)); *Perez*, 575 U.S. at 125-26 (Thomas, J., concurring in the judgment) (same); *see also City of Guyton*, 305 Ga. at 803 ("A significant criticism of . . . deference is that courts, faced with the task of interpreting difficult agency regulations, are often too eager to sidestep the obligation of discerning what the law is.").

[11] *See supra* note 10 & accompanying text; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (III) (B) (115 SCt 1447, 131 LE2d 328) (1995) (Scalia, J.) ("Separation of powers, a distinctively American political doctrine, profits from the advice authored by a distinctively American poet: Good fences make good neighbors."); *State v. Fielden*, 280 Ga. 444, 448 (629 SE2d 252) (2006) ("The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced . . . ." (punctuation omitted)).

[12] *See supra* note 9 & accompanying text; *see also Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 391-92 (870 SE2d 430) (2022) (Peterson, J., concurring) (acknowledging there are textual differences between the federal and Georgia constitutions regarding the extent of judicial power but that both nevertheless have standing requirements).

separation of powers among the three branches of government.[13] But again, I am not convinced there is a substantive or meaningful difference between the federal and Georgia constitutions on these foundational aspects of the American judicial power.[14] Put another way, I fail to see how the nature and structure of judicial power and the separation of powers in Georgia differs in any material respect from that exercised by our federal counterparts. I say this to emphasize the nationwide, systemic importance of the Supreme Court of the United States overruling *Chevron* this past term in *Loper Bright Enterprises*.

It is time, then, to return to first principles. As Chief Justice Marshall pronounced in *Marbury v. Madison*,[15] "[i]t is emphatically the province and duty of the

---

[13] *See supra* notes 9-10 & accompanying text.

[14] *See supra* notes 7-8 & accompanying text; *see also Loper Bright Enterprises*, 144 SCt at 2284 (Gorsuch, J., concurring) (noting that *Chevron* is "jarringly inconsistent" with "many longstanding precedents discussing the nature of the judicial role in disputes over the law's meaning"); *Kilbourn v. Thompson*, 103 U.S. 168, 190 (26 LE 377) (1880) ("It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial."); *Allen v. Wright*, 282 Ga. 9, 12 (644 SE2d 814) (2007) ("The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature." (punctuation omitted)).

[15] 5 U.S. 137 (1803).

judicial department to say what the law is."[16] And we must never forget that "ours is a government of laws, and not of men; and that the judicial department has imposed upon it by the constitution, the solemn duty to interpret the laws . . . it is not at liberty to surrender, or to waive it."[17] Suffice it to say, our founding fathers "anticipated that courts would often confront statutory ambiguities and expected that courts would resolve them by exercising independent legal judgment,"[18] not simply defer that judgment to executive bureaucrats.[19] So, the Court in *Chevron* "gravely erred" in concluding that "the inquiry is fundamentally different just because an administrative

---

[16] *Id.* at 177; *see also* THE FEDERALIST No. 78, at 467 (Alexander Hamilton) (C. Rossiter ed., 1961) (noting that "[t]he interpretation of the laws" is "the proper and peculiar province of the courts").

[17] *United States v. Dickson*, 15 Pet. 141, 162 (10 LE 689) (1841) (Story, J.).

[18] *Loper Bright Enterprises*, 144 SCt at 2266 (III) (B) (1) (majority).

[19] *See id.* at 2285-86 (Gorsuch, J., concurring) ("[Under *Chevron*-style deference,] [w]henever we confront an ambiguity in the law, judges do not seek to resolve it impartially according to the best evidence of the law's original meaning. Instead, we resort to a far cruder heuristic: 'The reasonable bureaucrat always wins.' And because the reasonable bureaucrat may change his mind year-to-year and election-to-election, the people can never know with certainty what new 'interpretations' might be used against them. This 'fluid' approach to statutory interpretation is 'as much a trap for the innocent as the ancient laws of Caligula,' which were posted so high up on the walls and in print so small that ordinary people could never be sure what they required.").

interpretation is in play"[20] because "[t]he very point of the traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities,"[21] and this "is no less true when the ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate."[22]

Additionally, as Justice Thomas explains in his *Loper Bright Enterprises* concurrence, *Chevron* deference "also violates our Constitution's separation of powers" by "curb[ing] the judicial power afforded to courts, and simultaneously

---

[20] *Id.* at 2266 (III) (B) (2) (majority).

[21] *Id.*

[22] *Id.*; *see also id.* at 2267 (III) (B) (2) ("[D]elegating ultimate interpretive authority to agencies is simply not necessary to ensure that the resolution of statutory ambiguities is well informed by subject matter expertise. The better presumption is therefore that [the Legislature] expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that [the Legislature] and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute."); *id.* at 2267-68 (III) (B) (2) ("The view that interpretation of ambiguous statutory provisions amounts to policymaking suited for political actors rather than courts is especially mistaken, for it rests on a *profound misconception of the judicial role*. It is reasonable to assume that [the Legislature] intends to leave policymaking to political actors. But resolution of statutory ambiguities involves legal interpretation. That task does not suddenly become policymaking just because a court has an 'agency to fall back on.'") (emphasis supplied)).

expand[ing] agencies' executive power beyond constitutional limits,"[23] as well as compelling judges to "abdicate" their "judicial power."[24] Finally, as Justice Gorsuch emphasizes in his *Loper Bright Enterprises* concurrence:

> *Chevron* deference . . . precludes courts from exercising the judicial power vested in them . . . to say what the law is. It forces judges to abandon the best reading of the law in favor of views of those presently holding the reins of the Executive Branch. It requires judges to change, and change again, their interpretations of the law as and when the government demands. And that transfer of power has exactly the sort of consequences one might expect. Rather than insulate adjudication from power and politics to ensure a fair hearing . . . *Chevron* deference requires courts to 'place a finger on the scales of justice in favor of the most powerful of litigants, the . . . government.[25]

So too in Georgia.

At its core, then, the issue of how much (if any) deference our courts should give administrative agency interpretations is really a question about the fundamental

---

[23] 144 SCt at 2274 (Thomas, J., concurring).

[24] *Id.*; *see also id.* at 2281 (Gorsuch, J., concurring) (noting that *Chevron* deference "runs against mainstream currents in our law regarding the separation of powers, due process, and centuries-old interpretive rules that fortify those constitutional commitments.").

[25] *Id.* at 2285 (Gorsuch, J., concurring) (citation omitted) (emphasis supplied).

nature of the judicial role. *Judges* are charged with interpreting the law, and deferring to the inherently biased interpretations of administrative employees is both an abdication of the judicial duty and antithetical to the rule of law.[26] It is long past time for our Supreme Court to drive a *Loper*-like stake in the heart of what remains of *Chevron*-style deference here in Georgia.

---

[26] *See City of Guyton*, 305 Ga. at 799 ("At the core of the judicial power is the authority and responsibility to interpret legal text."); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) (Dillard, J.) ("A judge is charged with interpreting the law in accordance with the original [or] plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *see also Michigan v. EPA*, 576 U.S. 743, 761, 763–64 (135 SCt 2699, 192 LE2d 674) (2015) (Thomas, J., concurring) ("The judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws. Interpreting . . . . statutes—including ambiguous ones administered by an agency—calls for that exercise of independent judgment. Chevron deference precludes judges from exercising that judgment, forcing them to abandon what they believe is the best reading of an ambiguous statute in favor of an agency's construction. It thus wrests from Courts the ultimate interpretive authority to 'say what the law is,' and hands it over to the Executive . . . [W]e seem to be straying further and further from the Constitution without so much as pausing to ask why. We should stop to consider that document before blithely giving the force of law to any other agency 'interpretations' of federal statutes." (citations and punctuation omitted)); *Forrest Gen. Hosp. v. Azar*, 926 F3d 221, 234 (III) (5th Cir. 2019) (Willett, J.) (noting that "interpreting the laws under which Americans live is a quintessentially judicial function" and "when legal texts are unambiguous . . . courts should stand firm and decide, not tiptoe lightly and defer"); *Ga. Lottery Corp. v. Tabletop Media, LLC*, 346 Ga. App. 498, 508 (816 SE2d 438) (2018) (Dillard, C.J., concurring fully and specially) ("The separation of powers is essential to the maintenance of our constitutional republic . . . .").